Bwight, Ref.
This is a motion made by the defendant to exclude evidence of the contracts alleged to have been made by Mr. Garrison with the plaintiffs, and at issue in this case, on the ground that they are obnoxious to the Statute of Frauds of the State of New York, and if not, to the provisions of that statute as prevailing in Missouri. For the purpose of clearness, it will be necessary to distinguish between the first alleged agreement, assumed to have been made March 39,1876, signed C. K. Garrison, and dated at St. Louis, Mo., and the latter oral agreement set forth in the complaint, and alleged to have been made in the month of June, 1876, at the city of New York. The first agreement is stated in the fifth paragraph of the complaint, to be evidenced in pari by a letter written by Garrison to some of the plaintiffs. The letter is attached to and made a part of the complaint.*
*217 The agreement supposed to be contained in the letter is resorted to in this action by the plaintiffs either as supplying a consideration for the later and oral con *218 tract, or as an original agreement modified by the oral contract. The introduction of the letter in evidence is objected to by the defendant as not complying with *219 the Hew York Statute of Frauds, on the ground that it does not “ express the consideration.” Its introduction in evidence is not otherwise objected to. It seems *220 to comply with the statute in other respects. It is sub- • scribed by the defendant and apparently contains a complete statement of the acts to be done and performed on the part of the parties to the contract.
*221 The plaintiffs allege that the consideration for the “letter” (for so the original contract is termed) is the compromise or adjustment of a doubtful cause of action on the part of the defendant against them as stockholders of the Pacific Railroad in Missouri. Their theory is that the defendant stood, as a large bondholder of this railroad, in the position of plaintiff in a suit to foreclose a mortgage on the Pacific Railroad of Missouri, pending in the year 1875 in the United States circuit court of Missouri, while the present plaintiffs were, as stockholders, substantially defendants in that suit. They assert that they had at least a plausible defense to the foreclosure, and that the adjustment of this controversy was a sufficient consideration for the promise of the present defendant, Garrison, contained it the so-called letter. This is a correct proposition upon general rules of law, and was so decided by the Court of Appeals in this cause on demurrer to the complaint (Marie v. Garrison, 83 N. Y. 14, 26).*
The next stage in the plaintiff’s theory is, that this letter being a good and valid contract, enforceable in *222 law, it was at the instance or request of the defendant Garrison modified or surrendered, and that this modification or surrender was a sufficient consideration for the oral modification or promise hereinafter set forth and concerning the same subject. To this proposition the defendant objects that the later oral agreement is in its turn subject to" the provisions of the Statute of Frauds, and that this cannot be' proved in this court even though the letter should be held provable. To this the plaintiffs reply that the court of appeals, in the decision just cited, in fact passed upon the question of the Statute of Frauds. For this statement they appeal to the briefs of counsel and to some references in the opinion of the court, tending to show that this tribunal was aware of the fact that the second contract was oral, while the defendant meets this suggestion by urging that there was nothing on the face of the complaint showing that the modified contract was oral, and that accordingly the Statute of Frauds could not, for that and perhaps other reasons, be considered on demurrer.
I shall discuss the question as though the matter were still open and without reference to any supposed decision of it by the court of appeals.
The defendants have set up the Statute of Frauds in' their answer, so that the question is fairly before me so far as the statute is sufficiently pleaded.
There appear to be four questions to be considered in this case:
I. Was there a consideration for the “letter,” so as to make it a valid contract %
II. Can the New York Statute of Frauds be applied so as to exclude evidence of the consideration of the “letter,” though the contract was made in Missouri, and to be performed there and the railroad property is situated there %
*223 III. If the New York statute is applicable, is the contract contained in the letter within the condemnation of the statute \ This includes the inquiry whether the consideration is “ expressed” in the letter within the meaning of the statute.
IV. Assuming that the New York statute is applicable and the letter is within its terms, and that the contract is void in law, was there any equitable right in the plaintiffs when the oral contract was made, sufficient to supply a consideration for that contract ? Beyond this, was there any form of consideration to which the plaintiffs can resort as supplying a sufficient basis for the defendants’ substituted promise.
To these propositions may be added the supplementary inquiry whether, if the New York statute is out of the way, the Ci letter” is within the Statute of Frauds of Missouri, and whether that statute can be invoked in the New York courts % I ought to say that the Missouri statute has not yet been proved in the case, as it strictly should have been, to authorize me to consider it. Yet, as the counsel on both sides have requested me to consider it by way of discussion or argument, I shall express my opinion upon it.
I approach the discussion of these questions with a sense of much responsibility, owing to the great amount in controversy, the thoroughness and extent of the discussions before me, and the ability and legal learning of the counsel in the case. Several of the questions raised are new and difficult. The great labor lavished upon them by the counsel admonishes me of the importance of bestowing much study and reflection upon the points at issue.
To avoid obscurity, I shall name each of the leading propositions above stated as a division of the iirst part of the opinion. The validity of the oral agreement will be discussed separately.
*224 PART I.
Division I.
Was there a sufficient apparent consideration for the letter so as to make it a valid contract %
In considering this branch of the subject, it will be necessary to refer to the allegations of the complaint, and to the testimony- already given in this cause, so far as it sheds light on the surroundings of the parties at the time the “letter” was written. It should be said that any conclusions at which I may arrive as to the present effect of the testimony are upon the evidence as it now stands, being evidence only on the part of plaintiffs. I am now simply determining whether I shall allow them to go on with their case or bring it to an abrupt conclusion by excluding all evidence of the contracts on which they rely. To do this, I must take their case as it now appears before me, reserving my opinion as to the true effect of the evidence until the case is closed.
It is right that I should consider the question of consideration for the “letter” before taking up the Statute of Frauds, since there must be a true contract before the question can be considered as to whether it is properly written-. There must be something to write before it, is to be written, and thus the Statute of Frauds adds one more requisite to a contract than existed prior to its enactment. This rule is laid down with distinctness in the opinion of Comstock, Ch. J., in Mallory v. Grillett (21 N. Y. 414), where he says, “ there can be no question under the Statute of Frauds in any case, until it is ascertained that there is a consideration to sustain the promise.”
The case to be dealt with is in substance as follows : The plaintiffs, prior to the date of the letter of March 29, 1876, were, in connection with one of the defendants, John T. Denny, owners, either absolutely or in trust for others, of 36,000 shares of the capitál *225 stock of the Pacific Railroad (of Missouri), a corporation organized under the laws of that State. Each share represented $100. Their holdings thus amounted to $3,600,000 of the capital stock stated at its par value.
Denny is made defendant because he refused to be one of the paintiffs {Code Civ. Pro. § 448).
The defendant Garrison was at the same time the holder of a large number of “Third Mortgage ” bonds of the same road, $2,200,000 out of a total issue of $4,000 000, secured by mortgage upon the road. There was, however, a controversy as to these bonds, considered as a valid obligation against the railroad, and particularly as to the validity of the third mortgage. The stockholders, as represented by the plaintiffs, claimed that the bonds were collusive and fraudulent, and thus the mortgage given to secure their payment was unauthorized by law. They further maintained that the directors of the road were parties to those collusive and fraudulent proceedings, and in fact hostile to the interests of the stockholders. They also maintained that Mr. Garrison was not a holder for value and in good faith ; that he held the bonds not as owner but as collateral security for advances, and that he had notice of the infirmity in the bonds before he advanced his money. It was on such grounds as these, that they maintained that they had a defense to the action for foreclosure of the third mortgage. At the time the letter was written, March 29, 1876, they had intervened in the action to protect their interests. They had filed an answer a„nd a cross-bill alleging collusion and fraud on the part of the directors of the railroad in the issue of these bonds as well as in the execution of the mortgage, and in the failure to make an efficient defense to the foreclosure. They had filed a petition to be made defendants in the cause, and had asked to be allowed to intervene and to defend the suit in their own behalf and that of other stockholders.
*226 I now proceed to give a general view of the testi-. mony so far as it bears npon these questions. The-rules of law permit the use of oral testimony for the purpose of showing the position and surroundings of the parties at the time the contract was entered into, • though not for the purpose of varying the terms of-the contract. In this respect there is no distinction between contracts actually in writing, but not required to be written, and the agreements to which the Statute of Frauds applies (Browne on Stat. Frauds, § 409, and cases cited).
Two railroad organizations are closely connected with the matters in controversy ; the Atlantic and Pacific Railroad on the one hand, and the Pacific Railroad (of Missouri). The latter, after the foreclosure of the third mortgage bonds, became the Missouri Pacific.For the sake of brevity in considering the transactions that led up to the letter, I will call the first the “ Atlantic,” and the other the “Pacific,” until it assumes its new name.
The “ Atlantic” road was originally chartered by the Government of the United States. Its eastern terminus was at Springfield, in south-western Missouri ;■ its western was San Francisco, California. It possessed a land grant covering land from Springfield to the Pacific Ocean. The “ Pacific” had a main line from St. Louis, Missouri, to Kansas City. There was also a southwest branch connecting with.it at the town of Pacific or Franklin, thirty-seven miles west of St. Louis andrnnning thence south-westerly through Springfield to the State line. There was here also a land grant from the United States covering land from the above-named town of Pacific to the Indian Territory. The land grants of the two roads (“Atlantic” and “Pacific”) interlocked, the one having Government lands southwesterly from Springfield of odd-numbered sections and the other with the even numbers. The “Pacific” road *227 forfeited its southwestern branch in 1865, or thereabouts, giving it up to the State. By a series of transfers (having become known as the South Pacific) this branch became merged with the “ Atlantic ” road. The latter railroad company was thus brought to the town . of Pacific, on the main line of the Pacific Railroad, and extending thence to the State boundary and thence into the Indian Territory, it had a road actually constructed of three hundred and twenty miles.
So far for the Atlantic road. Turning now to the “Pacific” road, at the time of the lease hereafter referred to, it appears that its line, commencing on the west bank of the Mississippi River within the limits of St. Louis, ran westerly to the western boundary of the State at Kansas City, a distance of two hundred and eighty-three miles. In addition to this main line, it had certain leaseholds. It ran through a very productive region of the State and through important cities. Its main line passed through the capital (Jefferson City), Sedalia and Warrenburg, to Kansas City; its leased line through Leavenworth, Atcheson, and Lexington. The “ Atlantic ” road passed through a much newer country and not so densely populated.
In the year 1872 the bonded indebtedness of the - Atlantic road consisted of a first mortgage of $7,250,000, and of a second mortgage of $3,000,000. There was also a mortgage on the land grant of $3,000,000. A portion of these bonds were in the treasury as unsold bonds. The amounts above stated were the authorized issues. The aggregate of the actual bonded indebtedness was $12,147,000. There was, in addition, a funded indebtedness incurred for the purchase of the South Pacific, amounting to $1,718,438. In later years the funded debt increased, so that on Dec. 31, 1874, it was $17,141,046. The floating debt was, on the same day, $1,405,513. The gross earnings of the At- *228 Ian tic road for the year 1872 $1,157,863.24; in the year 1873, $1,276,311.40 ; in 1874, $1,360,977.90.
I now turn to consider the gross earnings of the “Pacific” road. These were, for the year 1874, $3,713,-452.93 ; for 1873, $3,707,941.69; for the last half of 1872 (being that portion of the year embraced within the terms of the lease hereafter referred to), $1,924,; 918.92. The net earnings for 1873 were $1,402,715, and for 1874, $1,451,846. The bonded indebtedness of the “ Pacific ” road, in the early part of 1871, was $7,000,000, and a real estate mortgage of $500,000. It owed the County of St. Louis $700,000. The whole debt thus amounted to $8,200,000.
In the year 1871 there was a change in the management of the “Pacific ” road. New directors were introduced into the board. They were the chief owners of the “Atlantic” road, and directors of that company. They had become large purchasers of the stock of the “ Pacific ” road. After this change, one Andrew Pierce, a director in the “Atlantic,” became the managing operator of the “ Pacific ’ ’ road. In 1871, prior to the lease, a second mortgage was placed on the “ Pacific” road to the amount of $3,000,000. This was subsequent to the change above referred to in the ownership of the stock and the controlling management of the Board of Directors. The real estate bonds vtfere increased in 1872 from $500,000 to $800,000.
The “Atlantic” party are to be considered as having the control of the “Pacific ” from the time that they made the large purchase of stock in 1871, the sellers having agreed that the men who formerly represented their interest, and still remained directors, should vote as the “ Atlantic ” party directed them to vote.
In June, 1872, the directorship in the two roads was substantially the same, consisting mainly of the . same persons. On the 29 th day of that month these persons, in their character of directors of the “Pa *229 cific” road, directed a lease of that road to be made to the “Atlantic” road, which they accepted in turn as directors of that road for that company.
I pause here, in the narration of facts, to call attention to the proposition that these men, while holding a trust relation for each company, were assuming at the some moment to act both for the lessee and the lessor This double action on their part was inconsistent with their legal duty to each company. In plain language, it was a clear breach of trust, and their action was capable of being impeached in a court of equity, on the part of any stockholder who felt himself aggrieved.
It is unnecessary to charge these persons with an. intentional act of wrong. They were, however, bound to know the law, and to recognize the great and salutary rule that no person having a legal duty to perform toward another can voluntarily take a position inconsistent. with the performance of that duty. If employed to buy, he cannot sell; if employed to sell, he cannot buy ; so he cannot act both for a lessor and a lessee, particularly when discretion or judgment is involved in his action. The peculiarity of the present case was that the directors not only represented themselves and their friends, but the minority of the stockholders, including the plaintiffs, and that not of their own choice, but by force of a positive rule of law., which permits the holders of one more share than half of a railroad corporation to control its action. This rule is founded, no doubt, on wise, but certainly "on unfathomable reasons. Its existence could only be tolerated on the supposition that a majority clothed with this enormous power should not forget their trust obligations,- but should act in good faith and on sound principles of equity toward the minority, whom they thus arbitrarily represent.
I entertain no doubt that this lease was voidable at *230 the election of any or all non-assenting stockholders on the day it was made, and during the whole period allowed by the law or statute of limitations.
The general principle governing the subject is nowhere more satisfactorily stated than in the case of New York Central Ins. Co. v. National Protection Ins. Co. (14 N. Y. 85*). The court of appeals was at , that time (1856) composed of uncommonly able men, including Judges Denio, Alexander S. Johnson, and Samuel S. Selden among its permanent members, and William B. Wright and Thomas A. Johnson among its temporary members. There has been no better court in this State since its organization. The opinion of the court was written by the chief judge, Hiram Denio, inferior to none of them. One Stevens in that case assumed to act as agent between two corporations as in this case. On the one hand he represented an insurer, and on the other an insured. It was his duty in the one character to get the highest rate of premium and the most favorable terms for the insurer ; in the other capacity, he was bound to obtain the insurance at the lowest rate of premium and the most favorable terms for the insured. How could he hold the scales even between the two parties to the contract % The court said, on p. 91: “ The parties to the contract in this case are both corporations, and must of course transact their business through the instrumentality of agents, and Mr. Stevens was the agent of both parties. The plaintiffs were entitled to all his skill and ability, and the defendants had the like claim upon him. Neither required the services of an indifferent person whose object might be to secure equal advantages to both tké contractors . . . There was'a manifest inconsistency in attempting to negotiate this insurance as the agent for the insurers and the insured.” The court *231 then proceeded to hold the transaction voidable on principles of equity law as applied to trusts, p. 92. An even stronger case might be presented in such an instance as the present, than that contained in the above cit.ed insurance case. There the agent acting between the two companies was a mere intermediary ■and without any interest in the subject matter of the contract. How much more cogent must such a principle be, where a majority of directors of a corporation, being at the same time owners of a majority of the shares of stock, are successful in obtaining a majority of shares in another railroad, and a corresponding control, and thus succeed in obtaining a power to impoverish and in common parlance to “wreck” the latter for the interest of the former! The principle does not require that the power should be exercised corruptly. The power must not be allowed to exist at all. The court must hold with unflinching steadfastness that the dual directorship shall be disabled from representing the two corporations in any transaction requiring skill or judgment to be exercised for each. There is no middle course whereby solvent associations can be saved from the greedy grasp of unprincipled adventurers.
*230 Reversing 20 Barb. 468.
*231 I must accordingly, on the testimony now before me, hold this lease to be voidable at the election of the plaintiffs, unless I find sufficient evidence of their ratification of it.
It is to be noticed that the principle, as above stated, does not require that any unfair advantage be taken or, in the present instance, that any injury should be worked by the lease, to the non-assenting stockholders. They are not obliged to show any reasons for asking to have the contract set aside. They may simply plant themselves on the legal disability of the directors to do the act in question. The case cited shows that actual fraud is not a necessary ingredient *232 in the plaintiff’s case, p. 91. Still, 1 think that there are strong circumstances to show in the present case that the “Atlantic” directors intended to use and actually used the control acquired over the “ Pacific,” •for the advantage of the former, and with little, if any reference to the interests of the latter corporation.
I see no way of making such a lease binding on the non-assenting stockholders, except by ratification by them of the unlawful act. Such a ratification would require a clear understanding of the terms of the lease, and a distinct, unequivocal act on their part. I find in the case no evidence of sufficient knowledge of the facts, nor of the necessary acts of ratification. As to the necessity of such knowledge I refer to Pacific Rolling Mill Co. v. Dayton (7 Sawyer, 61).
There is another element of doubt which ought to be referred to.
There is strong reason to believe that a railroad company even with the full assent of the stockholders, has no power to make a lease, in. the absence of an enabling statute. It appears' to be clearly held in this state that a railroad corporation has no such power. Abbott v. Railroad Co. (80 N. Y. 27; S.C., 6 Am. R. 572), confirmed by a later case (68 N. Y. 107, 117). The opinion of Church, Ch. J., in the case first cited places the disability on common law grounds, see p. 80. He there says, “It has been repeatedly held in the English courts that one road cannot lease itself to another without the consent of parliament, citing Beman v. Rufford (1 Simons N. S. 550); Great Western Railway Co. v. Eastern Counties Railway Co. (9 Hare, 306) ; Winch v. Company (5 De G. & S. 562), as well as a number of American cases. The case in 86 IV. Y. 107, is one of a direct action between the lessor and lessee companies, and the lease was pronounced invalid, there being no express statutory authority to enter into it. As this is declared to be a general *233 rule of law, it must be assumed that this is the law of Missouri, until there is some proof to the contrary. In any event, there is strong reason, growing out of the semi-public character of railroads, why the courts should watch leases with great care. A lease may involve the shifting of responsibilities, waste of property, and injury to the commercial prosperity of the country traversed by the road. It ought not to be tolerated, unless fair in its terms, nor unless made to a responsible corporation, nor unless the rights of stockholders and bondholders are properly guarded and protected.
Finding a vice at the root of this lease, I do not think it necessary at this stage of the case to go into a detailed examination of the management of the board representing both companies. In general terms, it may be said that the whole conduct of the leased road displays the wisdom of the rule, to which reference has been made, disabling trustees from so dealing with trust property. Now, as “Atlantic” directors they dealt with themselves as “Pacific ” directors ; then they turned the tables, and as “ Pacific” directors dealt with themselves as “Atlantic” directors. The distinction between the two roads resolves itself practically into a matter of bookkeeping. Formally they were distinct; substantially they were one. Debts increased, then income bonds were issued, but could not be successfully floated. Then the same bonds were issued under the broader and more enticing name of improvement bonds, but they possessed an equal alacrity of shrinking. There was but one resource left to gain money and to defer bankruptcy, and that was the issue of third mortgage bonds. As the agreement in question in this action arose out of the foreclosure of these third mortgage bonds, it is desirable to consider these in their origin and progress toward conversion into ownership of the road with some fullness of detail.
*234 The third mortgage bonds were in form authorized to the amount of $4,000,000 by a stockholders’ vote, at a meeting held on July 10, 1875.
It is, however, claimed by the plaintiffs that there was in point of fact no sufficient authorization.
At the meeting above referred to, the stockholders were for the most part represented by proxy. The meeting was held in Missouri, at St. Louis, and the directors were still holding office, substantially as already detailed, and acting under the lease of 1872. The form of the proxy was follows : “ Know all men by these presents that stockholder of the Pacific Bailroad (of Missouri), owner of shares, have made, constituted and appointed lawful agent and attorney for and in name, to appear at a special meeting of stockholders of said Pacific Bailroad of Missouri, to be held in the city of St. Louis on the 10th day of July, 1875, for the purpose of voting upon the action of the directors of said Pacific Bailroad in authorizing the issue of $4,000,000 of bonds, and for the transaction of any other business which may come before said meeting, or at any adjournment thereof, and then and there, for me and in my name, to cast the vote to which is entitled as a stockholder, and which might cast if present. Witness, &c.”
This proxy was issued to the stockholders for their signatures. Assuming that it was necessary for the stockholders to assent to the issue of third mortgage bonds, there was a most extraordinary omission in failing to mention in the proxy the fact that a mortgage was to accompany the bonds to be authorized. It must be borne in mind that there were already bonds,out in various names, “Income,” “Improvement,” etc. A stockholder would naturally infer that one more attempt was to be made to find a bond under some still more captivating, name, which capitalists *235 would take. I think that there is a total failure in this case to confer upon the person holding the proxy the power to vote for a mortgage. This so-called “proxy” is nothing more than a power of attorney, and must be governed by the rules applicable to that class of instruments. “It is a well settled rule that all written powers such as letters of attorney, or letters of instructions, receive a strict interpretation, the authority never being extended beyond that which is given in terms or is absolutely necessary for carrying the authority so • given into effect” (Paley on Agency, by Dunlap, 4 Am. ed. 192, 193 ; North River Bk. v. Aymar, 3 Hill, 262 ; Cobbold v. Chilver, 4 Mann. & Gr. 62). It is the duty of one who acts on the basis of the powers granted in the letter of instructions to inspect it, and if the attorney or proxy goes beyond the written authority, his excess of authority is nugatory, and has no binding effect upon the principal (same cases). Applying this rule to the facts of the present case, it would seem clear that the proxy conferred no authority upon the holder of it to vote for third mortgage bonds. As the very great majority of the votes were given upon these proxies, I see no way of upholding the mortgage, provided the assent of the stockholders was necessary.
But more than this; the notice of the stockholders’ meeting which was published in the newspapers of St. Louis, and in reference to which the proxies were issued, contained information that the issue of mortgage bonds was contemplated. It was as follows: “A special meeting of the stockholders of the Pacific Railroad of Missouri will be held on Saturday, J uly 10, 1875, at 10 o’clock A.M., at the office of the company, in the city of St. Louis. The action of the directors in authorizing the issue of bonds to be used for the redemption and cancellation of bonds heretofore issued, and the execution of a mortgage to secure the *236 same, will be submitted to the stockholders for their approval,” etc., etc.
The notice sent out by mail to the New York and other stockholders out of St. Louis, omitted the word “mortgage,” and all the information that they could gather from the notice was that bonds were to be issued.
I have carefully considered whether any explanation of this difference between the notice as published in the St. Louis newspapers and that sent to the stockholders by mail, can be made consistent with good faith and fair dealing on the part of the directors. Up to this time I have sought for the explanation in vain.
I may pause here for a moment to summarize the conclusions which I have thus far arrived at. I regard the lease of the “Pacific” road to the “Atlantic” as voidable at the election of the stockholders who did not assent to it. I see no sufficient evidence that stock: holders appearing here as plaintiffs did assent to it. I think it extremely doubtful whether the one corporation had any power to make a lease to the other, even with the consent of the stockholders, unless some distinction is shown between the law of New York and Missouri, which, as yet, has not appeared. I am further of opinion that the requisite assent of the stockholders to the issue of the third mortgage was not obtained, and that the fact that it was about to be issued was withheld from them, or some of them, in the mailed notice of the special meeting, and in the proxy offered for their signature, and which they signed.
Had the third mortgage bonds been held by a person having full knowledge of the facts, they would have been, in my view, impeachable in a court of equity by the stockholders. It may be that they would .have been void in law as issued by persons claiming under a lease which was ultra vires, i. e., which the “ Pacific ” company had no inherent power to make, and which- *237 the “ Atlantic” company had no power to receive. In this view, the relation of lessor and lessee never existed, and the subsequent proceedings based on that relation must fall with it. But I do not place my decision upon this ground. I can hardly think that the mortgage was utterly void, unless there was a total want of power to make it. If the legal power existed, but it was abused, it would, I presume, be valid as to such of the stockholders as were directors and engaged in furthering it. They might be estopped from attacking its validity. I prefer to regard it as voidable. I proceed accordingly to consider the question as though there were merely a right in equity on the part of the stockholders to have the mortgage set aside, or to make an equitable defense in case of foreclosure. In that aspect, it might be of consequence that Mr. Garrison and others, bondholders, should occupy the position of holders in good faith.
It will be conceded that if these bonds were issued inequitably or even fraudulently, yet, as they were in the form of negotiable paper, if there was an apparent power to issue them, they might be enforced by a holder for value and in good faith.
Mr. Garrison held only $2,200,000 out of an'issue of $4,000,000. He might be a bona fide holder while others might not be. It would be competent for the stockholders to defend the action of foreclosure, in order to reduce the amount of the decree as well as to defeat it altogether.
This was the position of Commodore Garrison when the foreclosure of the third mortgage bonds was commenced. The stockholders were in a position to resist a foreclosure. They were defended by highly able counsel, as able, we are told, as there were practicing law in the city of St. Louis. They were likely to discover every flaw in the plaintiff’s case in that action. There were solid grounds for believing in a substantial *238 defense. Mr. Garrison’s only hope was to establish that he was a holder for value, and perhaps also show, on account of the fraudulent element in the case, that he was a holder in good faith. Even if he could show that, the foreclosure could only be for' $2,200,000, unless similar proof were offered by other bondholders ; if he could at most show $2,200,000, it would be comparatively easy for the stockholders to raise that amount and thus become active competitors in the purchase of the road, and thus perhaps prevent it from passing into his hands. Again, it might be dangerous for him to repose on showing that he was a holder for value, as the bonds might appear to be held as collateral, and accordingly only the amount actually advanced by him could be enforced.
It is thus evident that there might be strong reasons of a prudential nature, acting on the mind of a man of affairs, to justify a settlement by him with the stockholders and prevent the discussion of the legal questions involved in the case.
The theory on which I have proceeded thus far is that the proceedings of the directors, up to the time of executing the mortgage and incuding it, were voidable. It may be urged that the settlement was not. then a compromise. Conceding that, the case of the: present plaintiffs is not unfavorably affected. Instead' of a doubtful defense they had a clear defense which they were in a position to urge to the court. The surrender of such á defense must be even a more meritorious consideration than if the matter were doubtful. It is a settled rule of law that any inconvenience or injury to the promisee on the faith of the promise is a sufficient consideration to bind the promisor. White v. Baxter (71 N. Y. 254).* Nothing can be clearer within this rule than that the surrender of a good *239 defense would be a sufficient basis for an express promise.
It is now necessary to consider the position of Mr. Garrison as a holder for value and in good faith, at the time the foreclosure proceedings were pending. If their defense had been pressed by the plaintiffs, the burden of proof would have been upon him to show that he was a holder for value. (The cases on this subject are fully collected in Pars. on Bills, 188-191.) If he only advanced a part of the face of the bonds he could only recover so much as he advanced upon them. (Nash v. Brown, Chitty on Bills, 74; Allaire v. Hartshorne, 1 N. Y. 665 ; Brown v. Mott, 7 Johns. 361, and other cases cited in 1 Pars. on Bills, 191, note 1.) The defendant in this case has not yet had the opportunity to prove how much value he paid. The evidence thus far shows that he held many of the bonds as collateral security for the sum of fifty cents on each dollar of the face value of the bonds. Even if he had bought them at that price, in the case of fraud on the part of the directors, he would only recover in the foreclosure what he had paid, even though he purchased without notice of the fraud. (Same authorities.)
. There was, however, some evidence tending to show, that he had notice to put him upon inquiry as to the conduct of the directors and the qualities of the whole transaction through the contents of a speech delivered by one Mr. Bowman of St. Louis, an attorney at law, in Mr. Garrison’s presence and within his hearing, and that this speech preceded the defendant’s acquisition of the bonds or some of them and the foreclosure of the mortgage. I do not at this stage of the case lay much stress upon this evidence, as independently of it, I am of the opinion that there is sufficient evidence to cast the burden .of proof upon the defendant to show that he paid full value for the bonds. This has not so far appeared.
*240 The conclusion at which I have arrived is, that if the plaintiffs in their character of stockholders had continued their defense to the foreclosure, they would have had at least a plausible and perhaps good defense to the action or at least to a part of it. «
I shall now take up the foreclosure, and show the way in which the “letter” came to be written by the defendant to the plaintiffs.
The third mortgage, with accompanying bonds, was executed by the directors of the “Atlantic” road, in the name of the “ Pacific,” on July 10,1875. The first six months’ interest was made to fall due November 1, 1875, only three months and twenty days after the execution of the mortgage and the accompanying bonds. The interest falling due November 1 was paid. An action to foreclose the mortgage was commenced in the circuit court for the eastern district of Missouri on November 3 (three days later) by one George E. Ketchum, a bondholder under the third mortgage, proceeding in his own behalf, and that of other persons similarly situated. This will be termed the “Ketchum” suit. The mortgage ran for twenty years—only one semi-annual payment of interest was then due. The whole stockholders’ ownership was at stake for want of the insignificant sum of $140,000.
There is here something well nigh inexplicable. The prior bonds, for which these were a substitute, were “income” or “improvement” bonds, the equivalent of the “ incomes.” They were no lien on the road or its franchise, but only on the income—the net income. If no such income was earned, then no payment was to be made. In place of those already actually issued to creditors, there was now substituted a mortgage on the road and its franchises, which in three short months, for the non-payment of one installment of interest, was treated as wholly due (both principal and interest), although there was no clause in *241 the mortgage making the principal due and payable on non-payment of an installment of interest. Still the “Ketchum” suit treated the whole as due, and the foreclosure and sale were conducted on that basis. The “ Pacific ” company, by James Baker, their attorney, on February 7, 1876, made answer. Among other things, they stated in their answer that a portion of the stockholders claimed that the bonds were fraudulent, and that the directors were guilty of fraud in issuing them.
On March 25 of the same year the plaintiffs, or some of them, filed a petition to be allowed to come into the suit and defend, in behalf not only of themselves, but of all other holders or owners of shares of the stock who might come in and contribute to the expenses of the litigation.
Prior to this date there had been interviews between some of the plaintiffs and the defendant, in respect to the foreclosure and some mode of completing it whereby the plaintiffs would withdraw their opposition to it, and permit the brother of the defendant, Oliver Garrison, to be made a receiver, and allow the proceedings to go on to a decree and culminate in a sale. After much negotiation, the “ letter” now in question was signed by Garrison and delivered to the plaintiffs, as they allege, as a mode of settlement of the controversy. They were to withdraw their defense, as they say, and permit Oliver Garrison to become receiver, and this they did in pursuance of the letter. The defendant, however, objects to the introduction of all evidence of the consideration, on the ground of the Statute of Frauds. All I have now to decide is whether, if the Statute of Frauds be not in the way, there was a sufficient consideration for the promises in the letter in the action of the plaintiffs. The letter itself will be more conveniently stated at a later stage of this opinion.
*242 Considering the condition of the mortgage, the doubt of its validity, the burden of proof upon the defendant to prove that he acquired the bonds for value, and it may be to prove good faith, and that the action of the plaintiffs, at his request, relieved him from all difficulties, and enabled him to carry forward the foreclosure suit "with efficiency and certainty of ' result, I am of the clear opinion that there was not merely a technical but an adequate consideration for the promises made by him in the “letter” to the plaintiffs.
I say an adequate consideration, as that may become important in the view of a court of equity in upholding the contract.
Division IL
I have now arrived at the second inquiry. This is whether the New York Statute of Frauds can be applied in this case to exclude evidence of the consideration.
This question concedes, at least for the time being, that the, contract is valid by the law of Missouri, where it was made and to be performed, and where the prinpal subject-matter of the contract is situated. It is urged by the defendant that evidence of the consideration cannot be introduced, since the New York Statute of Frauds requires the consideration to be expressed in the writing, and that it is not so expressed. It is maintained by them as a proposition of law that the New York Statute of Frauds, as it now exists, is a rule affecting the remedy upon a contract within its terms—a rule prescribing evidence and accordingly a rule of procedure. If this be so, they further argue that a rule of evidence is a branch of the law of the forum—i. e., of the place where the action is pending —and that its rules must be followed in this case. It is, on the other hand, insisted by the plaintiff that this *243 New York law is so framed as to be a rule of substance, entering into the very existence of the contract. If so, they argue that as a question of validity the existence of the contract, according to established rules, is to be determined by the law of the place where the t contract is made. If valid there, it is valid everywhere ; if void there, it is void everywhere. It is thus a contest between the claims of the lex loci conlraetus and the lex fori—between substantive law and auxiliary law.
This question has, as far as the'researches of counsel extend, never been passed upon by the courts of this State.
The “letter” of Mr. Garrison is as follows :
To Messrs. N. A. Cowdrey, Robert L. Cotting, Jr., Peter Marie, Frank A. Otis, George R. Fearing, and John T. Denny.
“ Gentlemen,—In the event that the Pacific Railroad of Missouri is sold under foreclosure proceedings in the suit of George R. Ketchum, or any foreclosure suit now pending to foreclose the so-called third mortgage bonds of said Pacific Railroad Company, and in the event that I, or anyone for me, become the purchaser thereof, then I will agree to sell and convey said railroad as follows:
' “If at any time within six months from the date of such purchase by me you shall organize a successor company under the laws of the State of Missouri, and said company shall pay to me all sums of money (with interest thereon at the rate of seven per centum per annum from the date of my payment of the same) which I shall have expended in procuring or making-good the title to said railroad, and shall further pay to me all sums of money, with interest of seven per cent., that I may have expended, up to the date of the said purchase by said successor company organized by you, in the care, custody, control, and running of said rail *244 road, over and above the income received by me therefor, then I will convey to you or the said successor company, organized by you, the said- railroad purchased by me at said foreclosure sale, upon the further condition, however, that said successor company shall, immediately upon the making of the said conveyance to it of the said-railroad, make and issue its bonds, maturing in thirty years from their date, in sums of $1,000 each, and to an amount not exceeding $4,500,000, bearing seven per cent, interest, payable semi-annually, in lawful money of the United States, the first installment of interest to be payable in May 1, 1877, which said bonds are to be secured by a mortgage, or deed of trust, on the said railroad and franchises, which shall be conveyed by me to said successor company.
“ Of the said $4,500,000 new bonds, $2,431,000 shall be delivered to me or such associates as I represent, for their face value, and eighteen months’ interest of 2,200 third mortgage bonds, which I now hold. The remainder of said new mortgage bonds, viz., $2,069,000 shall either be given in exchange for a like amount of old third mortgage bonds or outstanding ‘improvement’ and ‘ income’ bonds, or the same may be sold upon the best available terms for the interest of the stockholders of the said successor company, and the proceeds of the sale applied to the payment of the money that may be required to purchase or pay any outstanding third mortgage bonds not represented by me, or any of the outstanding ‘ income ’ or ‘ improvement ’ bonds.
“It is understood that I may, if I desire, advance or loan the amount necessary to purchase any of the outstanding third mortgage bonds, or income or improvement bonds, above mentioned, and to hold the said $2,069,000, or a proportionate part of them, as collateral to secure 'the advances and interest thereon, .at seven per cent., so made by me. If there are any *245 bonds remaining after accomplishing the above object, they are to belong to the said successor company.
“The said new mortgage, and the bonds issued thereunder, shall be made under the advice of counsel learned in the law, and shall give as ample and full security for the payment of the bonds secured thereby, as can be given upon the premises mortgaged or conveyed to the said successor company. And if it can be lawfully done in the articles of association of said successor company, or otherwise, then the holders of said new mortgage bonds shall be entitled to ten votes at all stockholders’ meetings of said successor company for each bond so held by them.
“ The. said successor company shall issue a capital stock to the extent of $7,200,000, and you are to transfer the said stock to such of the present stockholders of the Pacific Railroad of Missouri as shall have co-operated with you, and to such as you think have any legal or equitable claims upon you for such stock; in both cases the holders of said Pacific Railroad stock are to transfer the same to the- successor company, or . to the trustees for their use. Any stock remaining in your hands, after satisfying the claims upon you, as above, shall belong to the successor company, and shall by you be transferred to said company as unissued stock.
“All expenses of the various litigations shall be paid from the earnings of the railroad, either by the receiver or by the successor company.
“My services and expenses shall be paid by the successor company, and your services, and expenses shall be paid by the successor company, or you may sell sufficient of the capital stock remaining in your hands, which would otherwise be returned to the successor company, to repay yourselves for your services and expenses.
“I wish it understood, that you or either of you, *246 or any other person at your instance or solicitation, may purchase said premises at said foreclosure sale, and I will do nothing to prevent competition, orto prevent others from bidding “at the sale ; I simply agree, that if the premises 'are sold in the said foreclosure suit, and I become the purchaser, that I will sell the same to you, or the successor company organized by you upon the terms above set forth. But I expressly stipulate, that unless all sums of money which I may have expended in the purchase of said railroad as aforesaid, and all sums which I may have expended.for.and on account of the same as aforesaid, shall be paid to me by you, or by said successor company, within six months after the date of mybecoming the purchaser of said railroad, then this agreement is to be null and void, and there shall be no right of purchase by you, or by any company organized by you of the said railroad.
“Time is the essence of this agreement, and the payment to me of the said sums of money laid out and expended by me as aforesaid with interest within the said period of six months is a condition precedent to your right or to that of said successor company, to purchase said railroad from me in the event that I become the purchaser thereof as aforesaid.
“St. Louis, March29, 1876. C. K. G-abbisou.”
The substantial part of this “ letter” is that the defendant, on a specified contingency (viz., should he purchase the railroad at the foreclosure sale), then, on the performance of certain acts by the plaintiffs, he agrees to “sell and convey” the railroad to them or to a successor railroad company organized by them. The “successor company ” is thereupon immediately to issue its bonds to a specific amount, to be secured by mortgage. A certain number of these bond are to belong to the defendant. The plaintiffs are to *247 become the holders of stock. The amount of stock issued is to be $7,200,000. The plaintiffs are to have enough to satisfy their claims, and the balance is to belong to the company. In other words and briefly, the scope of the transaction is to give bonds to the defendant and stock to the plaintiffs—practically all the stock in the road.
The defendant makes a preliminary criticism upon the whole trsnsaction. He argues that it is in substance no contract, as it depends wholly on the defendant’s will whether he will acquire the road. The theory seems to be that the defendant, being under no obligation to buy, there is no binding contract. Reference is also made in this connection to the fact that it is expressly provided in the “letter” that the plaintiffs may bid at the foreclosure sale, and that the defendant will do nothing to prevent, competition. The argument thus is, there is nothing to bind the defendant ; there is nothing to prejudice the plaintiffs. The whole field of purchase is as open to the them as to the defendant.
All this, in my opinion, does not prevent the letter from being a binding contract, assuming that there was a sufficient consideration. It falls under the head of a conditional contract—a contract with a condition precedent.
Contracts of this kind are common in law. One that is well known in commercial law is a sale of goods “to arrive.” If the goods arrive in port, they are sold ; otherwise not. The only distinction perceivable between this contract and the’ one at bar, is that while non-“ arrival ” may depend on an accident, non-purchase here depends on the will of the de. fendant. This would, however, seem to be an immaterial cirumstance. In some of the “arrival” cases the transaction was confined to goods shipped on the seller1 s account. Here the element of human, will is *248 introduced, for the seller can determine whether they shall be shipped on his. account or not. Still if they are so shipped the contract attaches and the transaction is valid (Vernedo v. Weber, 1 Hurls. & N. 311; Simon v. Braddon, 2 C. B., N. S. 324 ; Benj. Sales, 4 Am. ed. 1883, pp. 761, 762. So there maybe a contract on a condition that a third person shall do an act, as in Brogden v. Marriatt, 2 Bing. N. C. 473; Thurnell v. Balbirnie, 2 M. & W. 786.
It would be very strange and inconvenient if the law were otherwise. It is a frequent occurrence that a purchaser cannot obtain stocks or other like property without buying a larger amount than he desires. What is there in logic or law, to prevent him from contracting with other persons, that in case he buys the whole block of stock, they will take of him so much as he would like to spare? In such a case the. person supposed does not positively agree to buy. He leaves that open. What he does do is to bind himself that in the event that he purchases, the sub-purchasés from him shall take effect. All such arrangements I deem to be valid conditional contracts. The contract becomes absolute when the condition is performed. The only question then remaining is the Statute of Frauds.
The section on which stress is laid is the following (Rev. Stat., Part II., Chap. 7, Title I, Sec. 8; 2 R. S. 134, § 8 [3 Id. 7 ed. 2326]): “Every contract for the leasing for a longer period than one year, or for the sale of any lands or any interest in lands, shall be void unless the contract, or some note or memorandum thereof, expressing the consideration, be in writing and be subscribed by the party by whom the lease or sale is to be made.”
It is assumed by the defendant that the “letter” of March 29,1876, is in substance and effect a contract for the sale of land. Adopting that conclusion for the *249 moment, I have to consider whether the New York statute is applicable.
Before considering the question, it will be useful to quote in full the corresponding section of the English ' Statute of Frauds—the so-called fourth section: il No action shall be brought . . upon any contract for the sale of lands, tenements, and hereditaments, or any interest in or concerning them . . unless the agreement upon which such action shall be brought, or some memorandum or note thereof shall be in writing, and signed by the party tó be charged therewith, or some'other person thereunto by him lawfully authorized.’ ’
The seventeenth section of the English statute is also to be noticed : “No contract for the sale of any goods, wares, or merchandises for the price of £10 sterling or upwards, shall be allowed to be good, except the buyer shall accept part of the goods 'so sold, and actually receive the same or give something in earnest to bind the bargain, or in part payment, or that some note or memorandum in writing of the said bargain be made and signed by the parties to be charged by such contract,” etc.
Here, are three diverse forms of expression. In the fourth section (English) it is provided “ that no action shall be brought ” unless the statute is complied with ; in the seventeenth (English) no contract in violation of it shall be “ allowed to be good;” in the New York statute an agreement in contravention of its provisions is declared to be “ void.”
It is an obvious remark that it by no means follows as a matter of necessity that decisions upon one of these forms of expression shall be allowed to govern in construing another. The greater part of the discussion in the courts upon the question whether the Statute of Frauds is a rule of procedure or of substance, has been upon the fourth English section. The *250 controversy has been as to the meaning of the words “ no action shall be brought,” etc. These words came up for construction in the well-known case of Leroux v. Brown, 12 C. B. 801 (a.d. 1852). The facts are brief and well disclose the principle underlying them. It ■appeared that an oral agreement had been entered into in Calais, France, between the plaintiff and the defendant, under which the latter, who resided in England, contracted to employ the former, who was a British ' subject resident at Calais, at a salary of £100 per annum, to collect produce in France for transmission to the defendant in England—the employment to commence at a future day, and to continue for one year. It appeared that by the law of France such an agreement is capable of being enforced though it is not in writing. The defendant, however, insisted that although the contract was made and was valid in France, yet when an effort was made to enforce it in England, the English Statute of Frauds must be applied and all enforcement refused. This seemingly harsh, and inequitable doctrine was adopted and rested by the judges on the proposition that the statute supplied a rule of procedure—in this case a rule of evidence— and that the rules of evidence are to be sought in the law of the place where the action is brought. Thus Maulé, J., on page 805, said : “ The fourth section of the Statute of Frauds entirely applies to procedure.” Jervis, Ch. J., on page 824, in like manner declares that the fourth section applies not to the solemnities of the contract but to the procedure. He contrasts the words of the fourth with those of the seventeenth, and lays much stress upon the special words, “No action shall be brought.” Maulé, J., again recurs to the subject on pp. 826, 827, and further says, “ We have been pressed with cases which, it is said, have decided that the words ‘No action shall be brought’ in the fourth section are equivalent to the words ‘ no contract *251 shall be allowed to be good ’ which are found in another part of the statute. Suppose it had been so held as a general and universal proposition, still I apprehend it .would not be a legitimate mode of construing the fourth section to substitute the equivalent words for those actually used. ... It may be that for some purposes the words used in the fourth and seventeenth sections may be equivalent; but they clearly are not so in the case now before us. . . . Dealing with .the words of the fourth section as we are bound to deal with all words that are plain and unambiguous, all we say is that they prohibit the courts of this country from enforcing a contract made under circumstances like the present—just as we hold a contract incapable of being enforced where it appears upon the record to have been made more than six years. It is parcel of the procedure, and not of the formality of the contract.”
These last words show the theory of the court. That section of the statute does not enter into the contract at all—not even into its form. It is as much a rule of evidence as the old English rule, that a note complete in all respects could not be read in evidence without a stamp.
It is impossible not to perceive, in reading the opinions in this case, that the court proceeded solely on the special phraseology of the fourth section, and that the theory of the decision has no bearing upon the words of the seventeenth section. The later decisions in England show this to have been the judicial theory. This matter came up for consideration in this very year (1883). Adams v. Clutterbuck, 10 Q. B. Div. 403. The court in this case (which will be considered more at large hereafter), in commenting on Leroux v. Brown, at p. 406, says, “ that it turns on the provisions of the Statute of Frauds, the very *252 language of which indicates that it is part of the lex fori, and. not of the lex loci.”
The whole subject, as far as this section is concerned, is thoroughly considered in the very recent case of Britain v. Rossiter, L. R. 11 Q. B. Div. 123, by the court of appeal, composed of very able men, Beett, Cotton, and Thesiger, Lords Justices.
This case was one arising under the fourth section of the statute, and the question was whether the contract was void under that section. Carrington v. Roots, 2 M. & W. 248, and Reade v. Lamb, 6 Exch. 130, were cited to that effect, as they were also in the present case on the argument. The court, however, disposed of the remarks in those cases by stating that they were only dicta, unnecessary to the decision of the case, pp. 128, 130, 132 of the report. They then proceeded to hold that under the fourth section the contract, at all events, was not void. Thesiger, who wrote the most satisfactory opinion, said onp. 132, “it is impossible to say that the words of the statute make the verbal contract void.” The court added that the words only provided “ that no action should be brought,” etc., that the contract existed as a true contract, though not enforceable by a court of justice. Leroux v. Brown, supra, was cited with approval. Snelling v. Lord Huntingfield, 1 Cromp. M. & R. 20, ms referred to as containing a correct exposition of the law. This case also holds that though the contract cannot be enforced for want of a writing under the fourth section, still the oral contract is a true and existing contract. Kleeman v. Collins, 9 Bush (Ky.) 460, is a case upon a Kentucky statute, corresponding with the English fourth- section, and agrees with Leroux v. Brown, supra.
Thus far for judicial decision. The most approved text writers take the same view, and carefully distinguish between the fourth and the seventeenth sec *253 tion. Mr. Pollock in Ms excellent work on contracts (p. 574, 2d. English ed.), discusses the whole subject with much care and thoroughness, and while he states that the fourth section applies to the remedy, and disapproves on p. 575 of what he calls the dicta in Carrington v. Roots, supra, and in Reade v. Lamb, supra, making contracts under this section void, says this about the seventeenth section: “ The effect of the seventeenth section is generally understood to be different. It does not only prevent contracts for the sale of goods of the value of £10 or upwards, from being sued upon under the conditions specified, but enacts that they shall not ‘be allowed to be good,’ and although it has never been actually so decided, it is the accepted opinion in this country, that where the conditions (of that section) are not satisfied, the agreement is absolutely void” (574, 575). Professor Holland, of Oxford University, in his comprehensive work on “ Jurisprudence,” takes the same view on p. 207, where he says : “The English Statute of Frauds renders void any contract for the sale of goods for the price of £10 and upwards, unless there be a part delivery,” etc. The same statute, though it does not avoid the contract, allows no action to be brought unless it has been written down and signed, as for example, when it relates to an interest in land. Mr. Parsons has the same general view in his work on “ Contracts,” vol. III., 5th ed., pp. 56, 57.
It would appear, accordingly, that the decisions in England on th & fourth section of the Statute of Frauds depend upon the peculiar language of the statute. The statute affects the remedy simply and solely because it so provides in equivalent terms by stating that “ no action shall be brought unless the contract shall be in writing.” It is now proper to consider the decisions upon the terms of the seventeenth section.
That séction provides that a contract of sale of goods *254 “ shall not be allowed to be good,” unless the statute is complied with. Does this mean that the contract shall be absolutely void if not written 2 An ingenious suggestion has been made by Mr. Browne in his work on the Statute of Frauds, that this means good for the purpose of bringing an action upon it. This would make the words substantially equivalent to the fourth section (Browne Stat. Fr. §115). This construction seem to be adopted by the supreme court of Massachusetts, in the case of Townsend v. Hargraves (118 Mass. 325, 334). With all due respect it seems to me that such a mode of interpreting a statute is inadmissible. It interpolates words not found in it, and violates a settled principle of statutory construction which is to confine the meaning to the words used. The remarks of Maulé, J., already quoted in Leronx v. Brown, are very pertinent in this connection. I cannot follow such a method of interpretation. I must think that the words “shall not be allowed to be good,” mean that an unwritten contract within the statute is absolutely void.
Authority is not altogether wanting upon this point, the precise question having been adjudicated in Upper Canada, where the seventeenth section is enacted ; in so many words. Greene v. Lewis, 26 Upper Canada (Q. B. 618, a. d. 1867). The facts in that case were' that a contract for the sale of goods to the plaintiffs at a certain price, payable in Toronto, was made by the defendant at Chicago through his agent there. The goods were to be shipped by the Grand Trunk Railway from Chicago. No sale-note was signed by the broker who negotiated the sale before the action was brought. It was proved at the trial that the seventeenth section of the English Statute of Frauds was not in force in Illinois; and this is still the law there. The court held that the contract being valid in Illinois, where it was made, could be enforced in Canada, *255 though not in writing. The court said, “ We have seen no case in which, if the parties had bound themselves by a contract, lawful and obligatory in the place of making, its performance in another country would be refused, because certain solemnities, required by the law of the latter had not been observed in the original contract. If the parties have once bound themselves lawfully for any universally lawful purpose, such as in this case for the sale of goods at a fixed price, it appears to us that our courts must hold them bound here as they would be in the place of the contract.” The court then proceeds to distinguish the case under discussion from that of Leroux v. Brown, supra, making that turn upon the peculiar form of expression in the fourth section.
I regard this as a well-reasoned case, and very strongly in favor of the plaintiffs in this cause. The English court of exchequer in Noble v. Ward, L. R., 1 Exch. 122, said: “The expression £allowed to be good ’ is not a very happy one, but whatever its meaning may be, it includes this at least, that it shall not be held valid or enforced,” and held that a contract within its terms was not good for any purpose, p. 117.
To the same effect is Houghtaling v. Chapin, 20 Mo. 563 (a.d. 1855.). It is conceded by one of the counsel that the opinion in this case was delivered by one of the ablest of the judges that have adorned the bench of Missouri. Judge Scott, in his opinion, distinguishes between the words of the fourth and the seventeenth section, holding under the latter, that a contract for the sale and delivery of goods which is so completed as to be valid in the State where it is made will be enforced in Missouri, unaffected by the English seventeenth section (sixth section of Missouri statute). Leroux v. Brown, supra, was cited in that case and distinguished. The case of Smith v. Smith, 14 Vt. 440, 446, makes the construction of language equivalent to *256 the fourth section of the English statute turn upon the form of words used.
It is true that the Massachusetts cases in recent years hold that the words “not good and valid,” in the Massachusetts statute are equivalent to the words “ not allowed to be good” in the English seventeenth section, and that the latter words mean not good for the purposes of bringing the action, and that accordingly these words only affect the remedy on the contract (Townsend v. Hargraves, 118 Mass. 336 ; Norton v. Simonds, 124 Id. 21). If the court had reached the conclusion that the Legislature intended the words in their usual sense, it would undoubtedly have arrived at the same conclusion as the Upper Canada and Missouri courts. The difference between the courts is merely one of interpretation in the use of words not altogether plain in their meaning, and possibly admitting with some plausibility of an artificial or non-natural signification.
I think it proper to add that Mr. Justice Story has in several instances lent the weight of his great authority to the view that the seventeenth section 'makes the contract void if its requirements are not obscured. He first raised a query upon the point in Reimsdyk v. Kane, 1 Gall. 641, 642 (a.d. 1813). In Low v. Andrews (1 Story, 38, 42, a.d. 1839), he had definitely reached the conclusion in his own mind that the statute (seventeenth section) did not apply in the United States circuit court of Massachusetts to a contract of sale of goods made in France.
The result of this investigation appears to lead to the conclusion that the correct construction of the English seventeenth section is that it goes to the root of the contract when made in England, but has no effect whatever on a contract made in another State or country where it appears that a different statute exists, or that there is no statute at all. This qualification *257 must be made, for it is an open question whether it .can be assumed by the court in an action in one State, that the Statute of Frauds of that State is applicable to a contract made in another State where no proof is made that there is any statute of this kind in the latter State (Wilcox v. Green,* 72 N. Y. 17, 22). It is now time to consider more directly the exact provisions of the Hew York statute. It declares that a contract for the sale of land not “ expressing the consideration” shall be “void.” This-word “ void” is of infrequent occurrence in statutes of this kind, being found only besides in the case of a few of the Western and Southern States.
Can it fairly be said that a contract declared “ void” by statute still subsists as a contract, and that the only effect of the statute is to deprive a party of a remedy? Is such a word as “ void” a mere word of evidence ?
I think not. I regard the word “void” as a word of substance, and. not as a mere word of procedure. In that view, the statute cannot, by accepted rules under the “Conflict of Laws,” be applied to contracts made in other States, and accordingly not to the present case. The following arguments seem to me to affect this subject and to be decisive of it. (1) This is the natural meaning of the word “void” in a statute: “ The words of a statute, if of common use, are to be taken in their natural, plain, obvious and ordinary signification and import .... The current of authority at the present day is in favor of reading statutes according to the natural and most obvious import of the language, without resorting to subtle and forced constructions for the purpose of either limiting or extending their operation” (1 Kent’ s Comm. 463, star p. 12th ed. ; Waller v. Harris,† 20 Wend. 561. In *258 accordance with this general principle, it was declared in Mallan v. May, 13 M. & W. 511, to be the ordinary-rule • of construction that words were to be construed according to their strict and primary acceptation, unless from the context of the instrument and the intention of the parties to be collected from it, they appear to be used in a different sense, or unless in their strict sense they are incapable of being carried into effect. Following this rule, the word “void” should receive its natural signification. It was the apparent object of our Legislature to avoid the verbal distinctions of the English statute and to place all the cases in the statute on the distinct and intelligible proposition, that a contract in derogation of its provisions should be utterly void and of. no effect considered as a contract.
If the Legislature had a distinct purpose to declare the contract void, it is difficult to see how any other words could be employed The word “void” is used in a considerable number of our statutes, as in the usury ' law, the law against betting and against gaming and other acts deemed to offend against public policy. It is believed that no decision can be found that these statutes simply affect the remedy upon the contract, i They are of its very substance and life. The correct principle seems to be that the New York Statute of Frauds does not merely affect procedure, but is a great rule of public policy governing all contracts made and to be performed within the State. This doctrine is maintained by the supreme court of the United States in Mahan v. United States, 16 Wall. 143.
(2) The rule of Leroux v. Brown, supra, ought net to be extended to new cases not within the precise scope of this decision. It is a harsh rule and has met with adverse comment. It is a highly inconvenient rule in this country. Its sole effect is to deny to suitors in a sister State a remedy which they would *259 have in the State where the contract is made. Some of the distinctions of the New York Statute of Frauds are quite fine and perplexing. One is, that in the purchase of goods over $50 in value, if the contract is to be withdrawn from the operation of the statute by , the payment of a portion .of the price, such payment must be made at the time the contract is entered into. This is nob the general rule in the statutes of other States. If the construction claimed by the defendant in this case is to prevail, a farmer who sells wheat in Dakota to a New York buyer would have to know this intricate rule of New York law in order to hold the purchaser to his contract in our courts. So,Jay parity of reasoning, if he should happen to sue him in some third State having special rules, in making his contract he must have conformed to the laws of that State. If, on the other hand, the opposing rule should prevail, the Dakota seller would only have to know the laws of his own State in order to hold the buyer elsehere. I think that it deserves very serious consideration in our appellate courts, whether Leroux v. Brown, supra, ought not to be discarded altogether as highly technical and inconvenient. It is, of course, my duty, acting as a judge of first instance, to follow it in eases where it is distinctly applicable, but I do not feel willing to go further, and to extend its principle to new cases.
(3) The New York decisions, carefully considered, are in favor of the view that the contract under the present statute is wholly and absolutely void. I was strongly pressed on the argument with the case of Justice v. Lang,* 42 N. Y. 593; 52 Id. 323. The defendant insists not merely that the point decided in *260 that case should be adopted as law, but that the reasoning of the judge who wrote the opinion should be followed.
The point actually decided in that case was that if one of the parties to a contract within the New York statute subscribed the instrument containing it, he would be bound by it although the other did not. The course of reasoning, in part, by which the judge arrived at this conclusion, was that the Statute of Frauds was a rule of evidence, pp. 501, 522. This was not the whole of his reasoning. Much stress was laid upon the fact that the statute expressly stated that it was to be subscribed by the party to be charged, from which the judge inferred that it need not tie subscribed by both parties' as a means to charge the one who actually subscribed. It seems as though that was an intelligible proposition. It might be put in this form: while the statute requires the whole contract to be in writing, it does not necessarily require it to be authenticated by the subscripton of both parties. The law of mutuality usually prevailing in contracts may have an arbitrary modification by the statutes, which, like many other statutory provisions, cannot be vindicated by any course of reasoning. When the judge asks us to go further and to say that the existing Statute of, Frauds throughout all its branches supplies merely a rule of evidence when the word “void” is blazoned all over its provisions, we may-safely decline to follow him. The present case, be it observed, is a new one, and quite unlike the question in Justice v. Lang, not referring at all to the subscription, but to the body of the contract itself. Lord Tewtebdeit appears to have stated the rule as to the binding effect of former decisions correctly in this way: “I do not think the want of a satisfactory reason to be a sufficient ground for overturning a rule grounded upon the authority of decisions and of a practice long continued. But when *261 a question arises whether such a rule shall be applied to a new case, I think the want of such a reason authorizes me to say that it ought not to be so applied, if any distinction between the.cases can- be observed.” (7 Barn. & Cress. 195, 196.)
Something more than this must be said of the case of Justice v. Lang, supra. When the case came up a second time before the present court of appeals, there was evident dissatisfaction with the theory of the decision. The great difficulty with the case was that the decision amounted to the proposition that a promise void in law made by one party was a good consideration for the promise made by the other party (52 N. Y. 825). The first decision was followed on the second appeal, not because it was right but because it was res adjudicóla between the parties to the action. Still, Justice v. Lang is no doubt law as to the precise point decided by it (Mason v. Decker,* 72 N. Y. 598).
Dismissing, then, Justice v. Lang from consideration as not governing the present case, we come to a series of later decisions which appear to give the natural meaning to the statute. One of the earliest of these cases is Dung v. Parker† (52 N. Y. 494). This is an instructive case. In that case, the defendant falsely represented himself as being an agent for a land owner to lease land. He leased it orally for two years, in violation of the statute, to a tenant who put up fixtures and made other expenditures on the faith of the lease. The owner having repudiated the transaction, the lessee sued the professed agent for damages. It was conceded that he would have had a good cause of action if the lease had not been within the statute. The court held that the professed agent was not liable, on the ground that even if he had had authority to *262 . lease, the oral lease would have been void. The court said, “ A contract void by the statute is void for all purposes. It confers no right and creates no obligation, and no claim can be founded on it as against. third persons. It cannot be enforced directly or indirectly. The plain intent of the statute is that no person shall be subjected to any liability upon any agreement” within its terms.
In Bice v. Manley* (66 N. Y. 87) Dung v. Parker was distinguished, on the ground that in the first-named case there was a fraud, and that the invalidity of the contract could not be resorted to as a shield to, avoid the consequences of a fraud. .In Wheeler v. Beynolds† (66 N. Y. 227), the proposition is maintained that a contract not authorized by the statute is void in a court of equity, as well as in law. The invalidity of the contract is also maintained in Roe v. Barker‡ (82 Id. 431).
The whole question came up in a decisive form in the case of O’Neill v. New York Central R. R. Co.,§ 60 N. Y. 138. It was there held that the defense of the Statute of Frauds was not confined to the parties to the contract. A common carrier, for example, sued by the purchaser under a contract void by the statute, for the loss of the goods, could set up in his defense that no title passed to such purchaser. This proposition would seem to dispose of the question. If the invalidity of the contract can be set up in this collateral way, it would seem to be absolutely void (Pitney v. *263 Glen Falls Ins. Co.,* 65 N. Y. 6; Ely v. Ormsby, 12 Barb. 570 ; Hicks v. Cleveland,† 48 N. Y. 84; Young v. Blaisdell, 60 Me. 72, are to the same effect). Mahan v. United States, 16 Wall. 143, agrees with this view, under the words of a statute where the contract was declared “ not good or valid.” Consistently with this view, courts of chose states that decide that their own form of the statute affects the remedy, also hold that a third person or stranger cannot take advantage of it. (Townsend v. Hargraves, 118 Mass. 366; Norton v. Simonds, 124 Id. 21; Richards v. Cunningham, 10 Neb. 417; Davis v. Inscoe, 84 N. C. 396; Chicago Dock Co. v. Kinzie, 49 Ill. 289).
The only case, so far as appears, in which this particular question has been before a court sitting in this state is Allen v. Schuchardt, 1 Am. Law Reg. N. S. 14. This cause was in the United States circuit court for the southern district, before Nelsoet, J. The facts, were that an oral contract for the sale of goods was-made in Rhode Island, where the Statute of Frauds on that subject does not prevail, and it was sought to be enforced in New York. The court held that the New York Statute of Frauds did not affect the transaction, and that the contract could be enforced here. The opinion is very brief, and it does not appear from the report that the Statute of Frauds was pleaded, though that may reasonably be assumed. The case was affirmed on appeal to the supreme court of the United States, no mention being made in the opinion of that court upon this point.
It appears from the examination of the record in this cause in the circuit court, that the action was in assumpsit, and that the “general issue” was pleaded, and there was no specific reference in the plea to the Statute of Frauds. Still under the general issue in this *264 class of cases, advantage might be taken by the defendant of the Statute of Frauds under the plea of nonassumpsit (Gould Pl. 307, 4 Am. ed. ; 1 Chitty Pl. 500, 16 Am. ed. ; Browne Stat. Fr. § 411, and cases cited in note 3 to that section). The case was appealed to the supreme court of the United States on a bill of exceptions. The only exceptions noted were to “a refusal of the circuit judge to charge in accordance with the requests of the defendants solely on points concerning an alleged warranty in the sale. I regard the case simply as a circuit court decision, and yet entitled to much weight owing to the learning and ability of the eminent judge who rendered it. I also happen to know from a conversation with Judge Nelson, that he considered the point a highly important one, and that he had formed deliberate opinions concerning it.
I now proceed to state some special reasons why the New York Statute of Frauds, even though it might be held to be properly applied to some contracts made abroad, ought not to be extended to interests in land created under executory contracts for the sale or conveyance of land situated in another State or country: it is conceded by counsel on both sides that if any interest in land was created by the “letter” it was of an executory rather than of an executed nature.
Assuming, for the moment, the view most favorable for the defendant, that this was a contract for the sale of land situated in Missouri, made there, to be enforced there, and valid there, as soon as it was made, by ordinary rules of law, it created a trust in the land, and nothing more. This trust, it is to be assumed, was enforceable in the Missouri courts if the defendant remained there.
The general rule of law undoubtedly is that all questions as to the burdens and liabilities of real estate situate in a foreign country or another State depend *265 upon the law of the country where the real estate exists and upon nothing else. It may perhaps be questioned by some whether this rule is applicable to trust interests as vrell as to strict legal estates, for it may be plausibly argued that a trust is a matter of personal confidence, and therefore does not depend upon locality. The authorities upon this point are not very clear, and are certainly not very numerous. It must, accordingly, be considered upon principle.
It would seem that the same general rule should apply to trusts as to legal titles, so far as the subject under consideration is concerned. Lewin defines a trust to be “ A confidence reposed in some other, not issuing out of the land, but a thing collateral annexed, in privity to the estate of the land and to the person touching the land, for which the cestui que trust has no remedy but by subpoena in chancery,” p. 15. The words “annexed in privity, etc.” make it a burden upon the land as to any one in privity with the trust, as the present defendant xmdoubtedly is. One way of stating a trust is that it is a claim upon the land in the nature of a lien or superior right which may be sometimes enforced specifically, where there is a contract to that effect, or at other times may be worked out by a sale and payment of enough of the proceeds to the cestui que trust to satisfy his claim or equitable lien. This last remedy would apply to a vendor’s lien or implied trust, as in Day v. Roth, 18 N. Y. 448. The same rule has been applied to a vendee under a contract of sale. He has .alien for payments made, and if the vendor refuses to give a deed in violation of the contract, the vendee may have a sale to satisfy his lien (2 Washb. Real Prop. 4 ed. 98, 99).
The point was really decided in Waterhouse v. Stansfield, 9 Hare, 234. The facts of that case were no stronger than in the case at bar. One Moody agreed *266 by contract to purchase from one Grant real property in Demarara for a specified sum, and subsequently borrowed money, mortgaging the • contract, and then, getting into pecuniary difficulties, mortgaged it to another person. The mortgagees engaging in litigation, before the legal title was obtained, Moody the contractee became bankrupt. The assignees in bankruptcy completed the legal title, sold the land and transmitted the proceeds to England. Then Grant appeared upon the scene and claimed to enforce a trust against the proceeds, resting his claim upon the contract. Grant’s counsel maintained, as is claimed in the case at bar, that whilez the coney anee must no doubt depend for its validity upon the law of Demarara, yet. that the contract was of force in England as creating a trust, and as affecting the conscience of Moody or his assgnee, the court of England acting in personam, and further insisted that as the purchase money was within the jurisdiction of the court it ought to be applied for and accounted for according to English equities. The court held that the interest in the proceeds was in substance and effect an interest in the estate itself, and that no rule was more universal than that the lex loci rei sitce governs the disposition of the estate, p. 2S9. It was also held that whether there was an equitable lien or not, was a question of Demarara law.
This case certainly decides that if lands be situated in another State, if no trust arises there by means of a contract, it cannot arise here. It does not precisely decide that if a trust does arise there it can be enforced here. If, however, resort must be had to a foreign law to determine the existence of a trust, the “comity of nations” or of states would seem to require that if the trust existed abroad we should enforce it, if there were no positive statute or rule of law opposed to it. So, in the well-known case of Penn v. Lord Baltimore, 1 Ves. 444, the Lord Chancellor (Hardwicke) enforced *267 in England a contract between the parties for ascertaining the boundaries of Maryland and Pennsylvania. The foreign contract will be enforced, not against the land strictly, but in personam and by process of contempt.
In Harrison v. Harrison, L. R. 8 Chan. Appeals, 342, the question arose as to whether the English court would enforce, against parties within the jurisdiction, English equities against Scotch land. It was held that it would not, in general, since “ against the real estate in Scotland the courts of England hate no jurisdiction at allf p. 349. “ Any jurisdiction which they can exercise as to the real estate in Scotland can only be through the medium of some personal equity attaching to the owner in Scotland of that real estate.” As the court found there was no such personal equity, they dismissed the case for want of jurisdiction. The court in this case was composed of very able men, Lord Selbourne and the Lords Justices James and Mellish.
Mr. Westlake, in his able work on the Conflict of Laws, devotes paragraphs numbered 98 and 99 to this subject. In paragraph 98 he inquires, “What [is the rule] if any law, like the English, so subdivides the property into an equitable and bare legal one that the former is transferred by the contract of sale, yet so as to leave room for the suit of specific performance in order to obtain the transfer of the latter ? A question arises, How must the contract be evidenced in order that the equitable dominion may pass by it from the moment of sale % . . . We shall hereafter see that in the general conflict between the lex loci contractus and lex fori on solemnities, contracts must ordinarily be fortified by all the proofs required by either, since they will otherwise fail, either by the lex loci contractus as never having been originally binding, or by the lex fori as not having been originally evidenced. The latter part of the proposition is strictly applicable *268 to our case, with the observation that in it the lex fori is the lex situs, since it is only in the situs that the question whether the land is bound can be tried, and thus we conclude, for example, that English land cannot be transferred in equity by a foreign contract which does not comply with the English Statute of Frauds.”
This • principle would relegate the whole subject of the existence of the trust in this case to the law of Missouri, since, according to this author, Missouri is the only State where the question whether the land is bound can be tried.
A still further question is raised by Mr. Westlake in the 99th paragraph. He goes on: “ But is the former fact equally applicable, so that English land could not be transferred in equity by a contract satisfying that statute, but not also satisfying forms imposed by the lex loci contractus ? I apprehend that the reason here fails, for though we grant that a person not bound at the time,¡ and in the place of contracting, . cannot become so ex post facto by the accident of the former, yet the land in our case is not bound through any binding of the person, but by an independent operation of the lex situs on the right of property. We have seen that all dismemberments of the property in land are themselves immovable subjects of property, and as such alienated by the forms of transfer prescribed by the lex situs. The more obvious instances are dismemberments in duration, as successive estates, or in value, as charges, but the equitable dominion, entire both in duration and value, yet severed from the legal dominion, is but another kind of dismemberment, and the contract of sale, evidenced according to the law of the situation, is the appropriate form of its conveyance, and as such immediately and necessarily efficacious. Hence also it appears necessary to conclude that even the remedy by specific performance could be pursued *269 in our (English) chancery in such a case, notwithstanding the absence of the form of contracting required in he place of the contract. If not entitled ex contractu to a conveyance of the legal estate, the purchaser would at least be entitled to it as equitable owner, and this appears to be the opinion of Burge,” citing 2 Colonial and Foreign Law, 865,
This view, though expressed in a style somewhat obscure and rugged, is, in brief, that a contract, no matter where made, if complying with the forms of the State where the land is situated, makes the contractee dt least an equitable owner. It conveys the equitable estate to him as completely as a regular form of conveyance does the strict legal title, and the same reason exists for recognizing in another forum the equitable as well as the legal estate. All that a foreign court has to do, is to explore the law of the State where the land is situated, and to see whether a trust is created there. If satisfied on that point, nothing remains but to follow the “ comity of nations,” and to enforce the trust in personam against any one within its jurisdiction bound to perform it.
For the purposes of .this branch of the case, it is not necessary to go so far at this stage of the opinion as this author does, for the contract was both made in Missouri and to be performed there. I think that the reasonable view is that the Statute of Frauds in each State refers, as a matter of construction, only to the land situated in that State, as if those words had been set forth in the statute. It certainly must mean that as to conveyances. Why not as to executory contracts, so far as they create an interest in land % From that point of view, Mr. West-lake’s theory would be clearly correct. This point will be more fully elucidated when the oral contract is hereafter discussed.
Much practical inconvenience would Aoav from the *270 adoption of the theory claimed by the defendant. A man has entered into a contract in Missouri, which imposes upon him a conscientious obligation concerning his land. This obligation is, according to accepted principles of law, binding upon him in all places where he may be subsequently found, and where a court of equity exists. Under a technical, narrow construction of the Statute of Frauds, the duty cannot be enforced in a State to which he may have perhaps withdrawn for the purpose of evading it. The man thus has, in law, a territorial conscience—a conscience in Missouri, but no legal conscience in New York, and a reviving conscience perhaps in some other State, where there is no Statute of Frauds, or no such straight-laced construction of its terms. Such a doctrine confounds sound distinctions, and reduces equity law to a barren technicality. When the question is new in a State, as this is here, a judge may well pause before he gives his assent to a doctrine so destitute of correct moral sentiment, and so abhorrent to a philosophical administration of justice.
On the whole, I think that the New York Statute of Frauds is applicable in no respect to this “letter,” and particularly not to that aspect of it which might tend = to create an interest in the real estate to which the -• “letter” applies.
Division III.
I propose now to consider this subject on the hypothesis that the New York Statute of Frauds is applicable, and then ascertain whether the case falls within the statute. In other words, is this a “contract for the sale of land or any interest in land, etc.”
It may be well enough to refer to the well-settled rule of law, that contracts may almost, without exception, be made orally, unless the Statute of Frauds requires them to be in writing. To this proposition, *271 land is no exception. Abolish the Statute of Frauds and other kindred statutes, and every interest in land known to modern law.except an incorporeal hereditament may be created by word of mouth. Accordingly, it is not enough to bring this contract within the eighth section of the statute to show that it concerns an interest in land. It must, in substance, be a sale. A sale may include an exchange; but unless the transaction be in substance and spirit a sale, it is nob within the section governing the creation of executory interests in lands and may be made orally.
The question then is, was there a contract of sale in the present case % In order to have a sale, there must be a vendor and a vendee, and a thing or subject matter of sale. These are not present in this case.
(1) I do not regard the promise of the defendant to purchase at the foreclosure as a contract for a sale to him by the master in chancery within the statute. He was not by this contract bound to purchase. If he had definitely agreed to buy, it might become material to inquire whether the statute reached it. Thispoint will be presented under the modified or substituted oral contract, and will be considered in that connection. (2) I think it clear that the proposed successor company cannot be regarded as a vendee. It advances no consideration, and is merely an ingenious piece of machinery to carry out a plan for the mutual ^benefit of the contracting parties.
In order that a clear idea of this point may be obtained, it is necessary to recall for a moment the relations of the parties when the contract was made. The defendant was substantially a mortgagee, having the control of the foreclosure as he had the apparent ownership of a majority of the bonds. These bonds were, so to speak, “off color”—they were of doubtful-validity and válne. The plaintiffs, though not mortgagors in the strict legal sense, held under the mort *272 gagor, and would be deprived of their interest if a foreclosure took place. It was of the highest importance to them to be protected if a foreclosure occurred, and to still remain as nearly as possible in their original position. If this could happen, a foreclosure might be of advantage, as they would become disentangled from the moribund “Atlantic.” It was in turn of equal importance to the defendant to have his bonds made valid and placed beyond the breath of imputation. The arrangement was thus for mutual benefit, and a substantial continuation of the existing relations of mortgagor and mortgagee fortified' by a consideration advanced by the plaintiffs. To accomplish all that was desired, the breath of life must be breathed into a non-existent corporation, and the railroad and its franchises transferred to it to hold for the parties interested. The fair test of this executory transaction is to suppose it to have been executed in all its parts, and then to analyze it. This mode of treating the question is sanctioned by a great judge (Blackburn) in Wright v. Stavert, 1 Ell. & Ell. 729.
Proceeding in this way, assuming that this agreement had been carried out, neither the plaintiffs nor the defendant would have had any interest in land. The defendant would not, for he would have owned new bonds secured by a mortgage, it is true, but still his interest in the mortgage would have been a continuation of what he already possessed. It would have been personal property (Kortright v. Cady,* 21. N. Y. 343; Trustees of Union College v. Wheeler,† 61 N. Y. 88, 118; Trimm v. Marsh,‡ 54 Id. 599, 604, and other cases). If he acquired an interest in- land it would not be by a sale, for the corporation was but a fiction *273 created for his benefit. The plaintiffs would have had no interest in land. This point is thoroughly considered by a very able court in Watson v. Spratley, 10 Exch. R. 222 (a.d. 1854), in which elaborate opinions were written. The question came up there in its most abstract form, no corporation being interposed, but the title being vested in an individual for shareholders. It was a pure question of common law, and so treated by the court.
The facts of the case were, that Ah granted to B. a right to mine and carry away ore, minerals, metals, etc., on certain land. The legal right or title was thus vested in B. This person was really the instrument whereby the mining business was carried on by a number of capitalists who paid in their money, holding their capital in shares by agreement, depending on the amount of their contributions. These shares, by the agreement, could be sold, and the purchaser was placed in the position of the original shareholder. The expectation was that profits were to be made and divided among the shareholders according. to their respective interests. This-arrangement is called in England “the cost-book principle.” It is purely voluntary, and without corporate instrumentality. It was held that none of the shareholders had any interest in land within the Statute of Frauds; It had been well settled before this case that this was the correct theory of incorporated companies, created by Act of Parliament (Bligh v. Brent, 2 Y. & C. 294; Duncraft v. Albrecht, 12 Simons, 189). Here the question was, whether the rule was merely a statutory one, or whether it was a matter of common law, extending even to unincorporated companies. As put by Pabke, B., the rule of corporation law extends to all joint-stock companies where the persons seized of the realty hold in trust to use the land, make profits as part of the stock in trade, and then to divide those profits between the share- *274 holders whose only interest is in those profits, p. 344. Martin, B., discusses the whole subject from the same point of view at much length (see to the same effect, Hayter v. Tucker, 4 Kay & J. 243).
Gluided by these principles, I must hold it as a rule of the common law that the shares to be created for the plaintiffs under this “ letter ” were of the usual character of railway shares, and that whether the law of Missouri or New York is to prevail, they are not an interest in land within the Statute of Frauds.
(3) The only person having an interest in land under this contract is “ the successor company.” But how does this company acquire it ? not, under all the circumstances, by purchase. The transaction is not, as I regard it, a sale to the company, but a conveyance in trust. The company is nothing but a trustee for the defendant and his party, and for the plaintiffs and their party. Apply here again the test of Mr. Justice Blackburn, already stated, and inquire what would have been the position of “ the successor company ” if the title to the property had been conveyed to it, and it had refused to carry out the agreement. Would not any action to enforce its duty against it have been against it as a trustee % I „do not say that it is impossible for a company to be a vendee and also to be charged with a trust. What I maintain is, that under the circumstances there was n,o sale contemplated to the successor company. It was as far as the defendant was concerned, a conveyance to a trustee to pay a debt, and as far as the plaintiffs were interested, a conveyance to a trustee to enable the plaintiffs to make a profit from the busines of carrying goods and passengers by rail, subject to a prior claim against the property employed. There is at the utmost nothing in the “letter,” so far as the land is concerned, but a declaration of trust. The only section of the Statute of Frauds which can be applied, is that concerning *275 declaration of trusts in land. It is very doubtful, as will be shown hereafter, whether the statute on that subject can be applied to executory contracts. A doubt has even been raised whether a “ declaration of trust” can be made by way of anticipation and before a title has vested ; I do not rest at all upon the doubt. It is said in Jackson v. Moore (6 Cow. 706,726), that a trust may be declared either before or after a conveyance is made. The difficulty is whether, if there be an executory contract, it is necessary to declare the trusts upon which that contract is held in writing. This point may also be raised under the Missouri statute. An authority or two will be cited under that division of the argument.
If this “letter” be a declaration of trust, it would appear that the rule that “the consideration must be expressed” has no application. The conveyance of the land with the direction to use it in a specified way, and the acceptance of it by the grantee constitute the trust, and so the statute is satisfied. The statute only requires that the declaration of trusts shall be proved by any writing subscribed by the party declaring the same. The party declaring the trust in the case at bar is the defendant or the company whose title is taken. Assuming that he purchased at the foreclosure sale the trusts would at once attach, and on his conveyance to the company the trusts would continue. If there is any detail omitted in the letter which is necessary to carry out the intent of the parties, the court would under the doctrine “of executory trusts,” direct the needed thing to be done (Perry on Trusts, ch. 12; Lewin on Trusts, 144; Hill on Trustees, § 328). I am thus led to the conclusion that the letter does not come within any prohibition of the New York Statute of Frauds concerning sales or trusts of land.
There is one thing further to be noticed. Assuming that the contention of the defendant is correct, and *276 that the transaction is a sale of an interest in land, and that it is necessary to have the consideration expressed, is it not sufficiently expressed f The phrase “ expressing the consideration ” does not mean expressly stating it. It is enough if it be found or contained in the instrument by fair intendment. Is there enough in this “ letter” from which to infer the consideration? Remember that the consideration was the consent to the foreclosure, withdrawal of the defense, and the consent to the appointment of the receiver. I find that a foreclosure is referred to in the letter, and I think it could be shown by- parol evidence what this foreclosure was. It is stated that the plaintiffs were stockholders, and that certain persons were 1 ‘ co-operating with them.” Under that it could probably be made to appear that they were resisting a foreclosure. It is further said that the expenses of the various litigations are to be paid from the earnings of the railroad. This looks like a compromise of the suit. It seems to me, however, that the indispensable thing is wanting. It does not appear that all these things were done in consideration of the withdrawal of the defense by the plaintiffs. It is possible that an explanation of the word “ co-operating” would let in that evidence. Still, that is not certain and accordingly I am not prepared to hold that the consideration of the letter is expressed in it
There is the still further question raised by the defendants that the writing, though subscribed by the defendants, was not subscribed in accordance with the terms of the statute, viz., “ by the party by whom, the lease or sale is to be made^
If I understand the argument upon this point, it is that no one can properly “subscribe” under the statute but one in whom the title is vested at the time of the contract. In this case, that would be the old company or the Master in Chancery at the judicial sale. It would appear, if that were the correct con *277 straction, that the sale was “to be made” by him, so that perhaps both would have to subscribe to the contract.
Considering the great ability and acumen of the senior counsel for the defense, I can scarcely believe that this contention was serious. It certainly ignores the language of the statute. The subscription must be by a “party,” manifestly a party to the contract. The subject treated of in the first part of the section is an executory contract of sale ; the final words, “ sale to be made,” refer to the executed contract. In other words, A. agrees to-day that he will convey, thirty days hence, to B. The conveyance thirty days hence is “ the sale to be made.” There is nothing in law or reason to prevent A. from making the executory contract to-day, though he has no title, and only expects to be able to have the title when the appointed day for completion of the transaction arrives. It has been frequently held that it is no objection to compelling the vendor to perform, that he did not own the lands contracted when he agreed for the sale, if he owns them at the time of the action (Allerton v. Johnson, 8 Sand. Ch. 72, a. d. 1845). So where he owns a part he can be compelled to convey that part and make compensation for the residue (Morss v. Elmendorf, 11 Paige, 277, a. d. 1844). These decisions were made long after the present statute was enacted. If the defendant’s objection were well founded, these contracts would have been void and no action for specific performance against the vendor could have been entertained (Dung v. Parker, 52 N. Y. 494). To adopt the defendant’s theory would bring with it very serious consequences. Ordinary real- estate transactions would receive a new interpretation. If a man contracted to sell, having no title, how would the purchaser recover expenses of search or damages, the con *278 tract being utterly void for want of the subscription of the true owner to the contract ?
For these and other reasons, which it is unnecessary to pursue in detail, I do not think it necessary that the contract of sale should be subscribed by the owner of the land.
It is claimed by the plaintiffs at this point that the Statute of Frauds is not sufficiently pleaded to raise the questions involved here.
It is well settled under the code rules of pleading, that the Statute of Frauds must be set up in the answer. A general denial or issue under this system of pleading will not suffice, as it once did (Towle v. Topham, 37 L. T. N. S. 308).
Under these new rules now prevailing in England, as well as in this State, the language of the plea or answer must be clear and explicit (Browne Stat. Frauds, § 519, and cases cited).
The answer of the defendant as to this branch of this case seems to plead the statute only to the seventh division of the complaint. The seventh division of the complaint refers only to the oral contract, to be hereafter considered. It would appear that the statute was not pleaded explicitly to the “ letter,” as that is stated in the fifth division of the complaint. I do not desire, however, to place my decision upon this ground, but upon the broader grounds s§t forth in this opinion.
Division IY.
I now propose to examine the point whether the .Statute of Frauds of Missouri has been violated so as to affect the validity of the contract or its provability in this court.
Considering still the subject of the real estate embraced within the letter, I find that the statute of Missouri differs from our own in important respects. It has not yet been proved in the cause, but I have *279 been requested by counsel on both sides to consider the statute as far as the present question is concerned.
I have already indicated my opinion that this statute bears upon the present question, and that the real inquiry is, whether there is a valid trust by the law of Missouri.
• I do not think it necessary, however, to elaborate this point, since several of the inquiries to be made are similar to those already discussed. I only indicate the propositions which seem to apply to the" cáse.
(1) The contract for the sale of land is not made void in Missouri, if the statute is not complied with. It is only enacted that no “ action shall be brought,” in that case. Under the rule in Leroux v. Brown, supra, the remedy in Missouri only is affected by these words.
(2) There is nothing in the Missouri law requiring the consideration to be expressed. This brings up the point whether, independent of all express enactments, it is still not necessary to express the consideration by force of the word “agreement” used in the statute. On this question there is a great diversity of opinion among jurists, and in the courts of the several states. It is urged, on the one hand, that the word “agreement” from the very force of the term, includes the consideration, and that accordingly the consideration must be stated in the writing as well as the promise. Wain v. Walters (p Mast, 10), is the leading case on the subject, and was early followed in the courts of New York. The rule has been found inconvenient in England, and has been abrogated in part by statute, 19 and 20'Vict. c. 97. The courts of Missouri, on the other hand, have rejected the doctrine of Wain v. Walters, supra, holding that it is not necessary to satisfy the statute that the consideration should be expressed. Although these decisions have not been put in evidence yet, I am at liberty to refer to them as evidence of *280 Missouri law, for the purpose now under discussion. It is accordingly no objection to the contract in Missouri that the consideration is not expressed.
Bean v. Vallé (2 Mo. 126, 140, a.d. 1829), is a case quite in point. This was a case of a contract for the sale of land, to enforce which a suit for specific performance was brought. There was no statement of the consideration in the written memorandum, and the question was distinctly raised that the Statute of Frauds was applicable. Wain v. Walters, supra, was cited (see p. 137). The court said, among other things, that the word “agreement” was used by the Missouri legislature in its popular sense, without reference to the consideration of the promise or reason for making •it ,(p, 140). One of the judges dissented upon this point. This case seems to be a direct adjudication upon the point in question.
The question was again before the Missouri court in Halsa v. Halsa, 8 Mo. 303 (a. d. 1843). The court by Scott, J., treated the question as disposed of by the elaborate argument and discussions in Bean v. Vallé, supra. This was also an action for specific performance to enforce a contract for the sale of land.
In the case of Ivory v. Murphy (36 Mo. 534, A. D. 1865), the two cases already cited were reviewed. This was an action in the land court of St. Louis county for specific performance. It was claimed that there was a want of mutuality in the contract and that it did not comply with the Statute of Frauds. The cases of Bean v. Vallé, supra, and of Halsa v. Halsa, were approved by the court. It was said on p. 539, that Wain ». Walters, supra-, “ had never met the approbation of the courts of Missouri.”
(3) Assuming that the letter is a “declaration of trust ” in land, there is nothing in Missouri law to impair their validity or to lead to a doubt as to its compliance with the Missouri statute. , The statute *281 concerning declarations of trust does not differ materially from the provisions of a similar nature in the Statute of Frauds in England, nor from our own in New York. It is enough to show that the trust is mainfested or proved by some writing. I have already given my reasons for the belief that the trust is sufficiently declared to satisfy the New York statute. It is unnecessary to repeat them in this connection. It may be added that a case in the court in which this reference is ordered holds that a contract for the sale of land, being in its nature merely executory, is but a chose in action, and that a trust fastened upon it may be proved by parol evidence and that the statute concerning uses and trusts of land has nothing to do with it. Hazewell v. Coursen, * General Term, Monell, Sedgwick and Curtis, JJ. (a. d. 1873), 36 N. Y. Super Ct. (J. & S.) 460,468. It would seem from this decision that if Garrison had agreed to buy this road simply, and left all the purposes for which the purchase was to be made to an oral understanding, it could all have been established by parol evidence. Assuming this to be the meaning of this case, I suppose that it would be necessary to hold that so far as the trust was written, so far the writing would have to be followed ; so far as it was imperfect on its face, it might be supplemented by parol evidence. It is also held in other authorities that the doctrine of resulting trusts does not apply to executory contracts for the sale of land (Jackson v. Morse,† 16 Johns. 197).
The conclusion then is that this letter, whether tested by the law of New York or Missouri, does not trench upon any provision of the Statute of Frauds.
*282 Division V.
' I now propose to consider this subject from a different point of view. Assuming that this contract is void under the statute of either State and incapable of enforcement here for that or any other reason, have the acts" of the plaintiffs on the faith of the contract been such as to withdraw the case in view of a cov,rt of equity from the operation of the statute, and thus supply an equitable consideration for the subsequent or oral contract to be hereafter considered?
It is plain that if the “letter” is to be treated merely as a consideration for the oral' contract, it is quite immaterial whether it is good simply in equity or both in law and equity. The surrender of an equitable cause of action is just as good a consideration for a subsequent promise as the surrender of a legal cause of action. Any detriment which the plaintiff may receive (Williamson v. Clements, 1 Taunt. 523), or any benefit which the defendant may receive by the permission or act of the plaintiff, is a sufficient consideration (Davis v. Morgan, 4 B. & C. 8 ; Scotson v. Regg, 6 H. & N. 295). Chitty says, that any damage or any suspension or forbearance of right or any possibility of a loss occasioned to the plaintiff by the promise of another, is a sufficient consideration for such promise (1 Chitty Cont. 35, 11 Am. ed.).
From this point of view the allegations of fact are, that the plaintiffs on the faith of the promises of the defendant, did actually consent to the appointment of Oliver Garrison as receiver, withdrew their defense to the foreclosure suit, and submitted to a decree of sale, and that the sale actually took place to Mr. Baker, acting as they say, for the defendant. It is not necessary to discriminate between these acts so as to say that they are to be imputed separately either to the “ letter ” or the oral contract. So far as they relate to *283 this letter now under discussion, they are in the nature of an executed consideration. Though I am inclined to regard the oral contract as a modification of the letter rather than a new contract by way of substitution, yet in whichever way it is treated, it remains true that the whole consideration was executed and made over to the defendant on the faith of his promise. I shall accordingly, to avoid repetition, consider the subject of performance as raising an equity in favor of the plaintiffs, once for all, without discussing it anew at any length when the oral contract is directly reached.
This is not a case of payment of the consideration in money, which might be recovered back by the plaintiffs on the breach of contract by the defendant, and they be restored to their original position. It is, and has been ever since the decree, impossible to restore them to the place in which they were prior to the acceptance of the letter. Their defense, whatever its merits may have been, was thenceforth forever precluded. No court could or would relieve them, there being no fraud in the making of the contract, and no case in their favor except the failure on the part of Garrison to fulfill his agreement. The remedy for that is not the cancellation of the transaction, but solely the enforcement of the contract. On such facts, courts of equity constantly and uniformly hold that there is a constructive or equitable fraud in not fulfilling the engagement made. The fraud in such cases is not-in the concoction of. the contract, but rather in obtaining and retaining its advantages, and still refusing to fulfill one’s own stipulations^ The rule that the court will interfere in favor of the injured party, on the ground of this inferential or “ constructive fraud,” gives him an equitable cause of action. It is on this ground that the courts say that the jurisdiction of equity in such case is bottomed in fraud.
*284 The authorities upon this question are clear and distinct. In Malins v. Brown, 4 N. Y. 403, it appeared that A. was drawn into a purchase of land from B., which he wnuld not have made but for the oral agreement of C., a mortgagee of the land, to discharge the lien of his mortgage. It was held that a recovery from C.of the money paid to him would not restore A. to his former situation, and that this would operate as a fraud upon him unless the oral agreement were carried into complete execution. Accordingly he was entitled to relief notwithstanding the statute.
Ryan v. Dox, 34 N. Y. 307* (cited and commented upon fully in the argument by the plaintiffs in this cause), is an important authority. The substance of this case is, that Ryan and another were owners of an equity of redemption subject to a mortgage, and that, a foreclosure being about to take place, Dox promised orally to attend the sale, bid in the premises for Ryan, and his associate, and to hold them as security for the money advanced. Dox purchased accordingly with the understanding of the mortgagors and others present at the sale, who abstained from bidding on the supposition encouraged by Dox that the purchase was really for the benefit of the mortgagors. Dox in this way bought for $100 premises worth $4,000, and refused to fulfill his promise. The court held that this course of action was a practical fraud on the mortgagor and relief was granted.
The court, on pages 318 and 319, says: “ The fact that an agreement is void under the Statute of Frauds does not entitle either party to relief in equity, but other facts may ; and when they do, it is no answer to the claim for relief that the void agreement was one of the instrumentalities through which the fraud was *285 effected (citing Ormond v. Anderson, 2 Ball & B. 369). Where one of the parties to a contract, void by the Statute of Frauds, avails himself of its invalidity, but unconscientiously appropriates w7iat 7ie 7ias acquired under it, equity will compel restitution ; and it constitutes no objection to the claim that the opposite party may happen to secure the same practical benefit which would have resulted from the observance of the void agreement,” citing many cases.
There is nothing in the later decisions of the court to shake the principle laid down in Ryan v. Dox. Levy v. Brush, 46 N. Y. 589,* was cited by the defendant as favorable to his view. This was a mere oral promise by A. to B. to bid at an auction sale upon certain real estate, and to pay from the same with 7iis own funds. B. was to reimburse one-half of the money so paid, and the deed was to be taken in the name of both. A. having purchased the land and refused to perform the promise, it was held that it could not be enforced. The court said, on pp. 596-597, that no trust-had been raised in favor of the plaintiff because no part of tiie consideration 7iad teen paid, and tiiere 7iad teen no change in the plaintiff1 s position, recognizing Ryan v. Dox, and at the same time distinguishing the case in hand from it. The question came up again for consideration in Wheeler v. Reynolds, 66 N. Y. 227. This case in some of its parts resembled Ryan v. Dox, supra, but lacked its essential feature. There was no agreement or understanding that the plaintiff should not attend the sale, or that tie should prevent others from tidding (see p. 230), while, on the other hand, there was proved in Ryan v. Dox a reliance by the plaintiffs on the promise of the defendant to bid, and so they made no effort to procure the money or the *286 assistance of friends to save and bny the land, p. 233. It was the reliance by the plaintiffs on the conduct of the defendants in the one case, and the non-reliance in the other, that distinguishes Ryan v. Dox from Wheeler v. Reynolds.
The case of Ryan v. Dox has met with emphatic re-affirmance in Robbins v. Robbins, 89 N. Y. 257.* The court uses strong condemnatory language of the conduct of one who retains the consideration of a contract or of a conveyance, and still refuses to perform what he has agreed.
The facts of the case at bar, as now presented, appear to me to be even more favorable to the plaintiffs than those in Ryan v. Dox. In the present case the plaintiffs, relying on the promise of the defendant, withdrew a defense which they were competent to urge. They assented to a foreclosure cutting off affirmatively, and with their consent, all their rights. They remained away from the sale more than a thousand miles, with no communication except by telegraph, and having, as far as appears, no one to advise them except the defendant. They were bound hand and foot by their consent to his action. The defendant, having this advantage over them, does not, accord, ing to their evidence, fulfill his promise. He buys, but buys for himself. Oould there be any stronger set of facts for the application of- the equitable rule that we have been discussing % I think not.
Accordingly, whether the letter be considered as the principal contract and the subsequent oral agreement a modification of it, or whether the letter be treated as a consideration for the oral contract, in either case I think that there is an equity which is derived from the fact that the plaintiffs cannot be restored to their original condition. I am clear that, *287 treated as a mere consideration, the plaintiffs are entitled to the benefit of it as the action is now framed. It is, however, claimed by the defendant that, owing to the present condition of the pleadings, such an equitable right cannot be made available as. a cause of action in this case, at least without an amendment of the pleadings, and it may be not at all. At this stage of the case, the equitable element is simply regarded as a consideration for the oral contract. Later in this opinion the question of the right to use these equitable circumstances as a cause of action will be regarded.
Division VI.
Thus far I have considered the letter as merely concerning real property. My attention has been called to the fact that by a statute of Missouri, the locomotives, cars, etc., of railroads are declared to be personal property. Although that statute has not yet been put in evidence, the question of the applicability of the New York and Missouri statutes has been discussed by counsel. I shall give my opinion briefly upon the points that might arise under that aspect of. the case. Much of what has already been said I regard as applicable.
(1) I am of the opinion that the New York Statute of Frauds cannot be applied to the personal property any more than to the real estate.
(2) The Missouri statute is applicable to it, and if the “letter” contravened the statute, and the contract was void there, it would, I think, be void here. The words “shall not be allowed to be good,” a reproduction of the language of the seventeenth section of the English statute, produce an effect upon the substance of the contract. The rule would then' apply, that a contract void in the place where it is made, is void everywere.
(8) I think that the present contract, so far as the *288 personal property is concerned, is not witin the New York or Missouri statute, partly for the reasons already given in the discussion of the real estate branch of the subject. The letter must be taken as a whole, and as embracing a complete purpose, being an intent to transfer the entire property to the “successor” company. If there be a trust at all, the whole property is enveloped in a single trust. There is no more a sale of the rolling stock than there is a sale of the road-bed and other items of real estate. The defendant intended to have the mortgage cover the whole property, and the plaintiffs anticipated that their shares of stock appertained to the whole. The declaration of trust, if any, embraced the whole property. The construction given to both parts of the transaction must be uniform.
(4) There is a special reason why this transaction cannot be a sale within the statute. In order to set the statute in motion, there must be a price. This implies an estimation of the value of the consideration in money. No money was paid by the plaintiffs. Again, the price must be fifty dollars or upwards. The party who seeks the protection of the statute must show affirmatively that Ms case is within it (Crook-shank Burrell, 18 Johns. 58). How can it be¡ said, at least at this stage of the proceedings, that fifty dollars or any other fixed sum was in the contemplation of the parties, as the value of the considesation advanced by the plaintiffs % An exchange of goods for goods has been held not to be within this branch of the statute, as there is no “price” in the statutory sense. (Woodford v. Patterson, 32 Barb. 630). The test of a sale of goods is a price in money (Vail v. Strong, 10 Vt. 457). A sale is a contract to pass right of property for money (Huthmacher v. Harris, 38 Pa. St. 491; Wittowsky v. Watson, 71 N. C. 451). In England the word “price” in the statute has been changed for “value” (Lord Tenterden’s Act, 9 Geo. IV. c. 14). This act had *289 the effect of substituting “ value” for “price ” in the seventeenth section (Scott v. Eastern Counties Railway Co., 12 M. & W. 33; Harrison v. Reeves, 18 C. B. 587). These cases affirm the proposition that after this substitution the court could look dehors the contract to ascertain the value of the goods, but could not before. Moreover, no “ goods, wares, or merchandise,” under the Missouri statute, nor any “goods, chattels or things in action,” are sold within the New York statute. The statute refers to a sale as between the plaintiffs and the defendant. The agreement of the defendant to buy at the judicial sale of the road is not within the statute (Browne Stat. Frauds, § 363 a). This may be asserted on two grounds: one is, that the policy of the statute does not extend to judicial sales by way of foreclosure, as they are under the guidance and sanction of the court and do not fall within the mischief of the Statute of Frauds (Smith v. Arnold, 1 Mas. Cir. Ct. 420; Browne, §§ 264, 265). The other ground is that an agreement to buy of a third person is not within the statute. The statute refers to transfers of goods as between the parties to the contract (Browne, § 263 a).
The case of Horsey v. Graham, L. R. 5 C. P. 9, was cited as adverse to this view by the defendant. This case, however, is very wide of the case at bar. A broker in real estate in that case agreed unconditionally to “ get a lease ” from a land-owner to the plaintiff for a specified sum. The court treated it as analogous to a contract of sale when the vendor did not own the property, but agreed to get it and make it over to the vendee. Bovill, Ch. J., said, on p. 13: “The contract relied on by the plaintiff in this case is a contract by which he was to acquire a lease of, and thereby an interest in, the land. It is said that the defendant had not any title to the land himself, but an ordinary contract for the sale of land is always alleged as a con *290 tract by the vendor to malee a good title, and does not necessarily imply that the vendor has any title himself and if there are outstanding mortgages, the vender gets them assigned, and so makes a good title. Such a case is very similar to this.” Horsey v. Graham is thus seen to be the ordinary case of selling what one does not own, but what one expects to buy—a mere executory sale or leasing of what one does not own, but what one ex¡3ects to own and control. Mather v. Scoles, 35 Ind. 2, is of the same nature. The defendant agreed to procure the conveyance from one Evans to the plaintiff of a parcel of land. This was equivalent to an agreement that the defendant would convey, or cause to be conveyed, to the plaintiff, a parcel of land wrhich he did not then own, but the title to which he would procure. There is no true analogy between such a promise and that, to buy and convey to a third person like this “successor company” for the purposes named in the letter.
Some reliance was also placed by the defendant on a passage in Browne Stat. of Frauds, § 263 a, as follows: “In case of a promise to the plaintiff by the defendant to buy land for himself from a third party, if the third party be the nominee for the plaintiff .... the indirect interest of the plaintiff in the purchase itself, may draw the contract under the operation of the statute,” citing Chiles v. Woodson, 2 Bibb (Ky.) 72. This is certainly a very guarded suggestion, without any definite expression of opinion by the writer. There is certainly no foundation for the utterance in the facts of Chiles v. Woodson. There the defendant, according to one line of testimony, had become the grantee of land in trust for one Craig, under an express stipulation that he would convey to any one to whom Craig might sell. The plaintiff alleged that he applied to the defendant to know whether he would release to him in case he purchased of Craig, and that he *291 expressly agreed to do so, in consequence of which he bought the equitable estate of Craig in full expectation that the defendant would convey the legal title, which he then refused to do. The analysis of this case is that it was a direct sale between the vendor and vendee, except that the purchase-money was to be paid to a third person, viz., Craig, nominee of the defendant, the vendor. In other words, the defendant orally promised to sell to the plaintiff, for a fixed price, at the same time saying to him in substance, when payment is to be made do not pay me, but pay Craig. The contract being direct by the defendant to sell to the plaintiff, what difference does it make to whom the purchase money is, in fact, to be paid ? Suppose the defendant had, as a part of the transaction, assigned the purchase money to Craig, would that fact have taken away from the transaction the character of a contract of sale ? In what substantial respect does the course pursued by the parties differ from such an assignment ? This case has been developed, in this opinion, at some length, since much was made at the argument of the expression, “nominee of the plaintiff.”
Further, the agreement to convey to the successor corporation is not in any respect a sale to th% plaintiffs. The corporation gets the title not for the plaintiffs exclusively, but to carry out the whole arrangement to execute the entire trust. The successor company is not an “ alter ego” of the plaintiffs. It owns the whole property, and the plaintiffs acquire but a thing in action, not by way of purchase from the defendant, but as one of the modes of executing the trust imposed upon it.
It is, however, said by the defendant that assuming that the statute has not been complied with as to the goods, the contract is void altogether, on the principle that, where the consideration is entire a contract void in part under the statute is void in toto. A number of *292 cases were cited to that effect. This is, undoubtedly correct where the question is presented in a court of law in a case proper for the application of the rule. But if the real estate part of this contract is withdrawn from the operation of the Statute of Frauds, the principle will not be applied. Otherwise the injured party would not receive full compensation. This point was ruled in Smith v. Smith, 14 Vt. 440.
If a court of equity should hold that the real estate was withdrawn from the statute by force of the fact that the consideration was fully paid, and that parties cannot be restored to their original position, and did not hold the same theory as to the personalty, complete restitution, as required by the rule in Ryan v. Dox, would not be made. The plaintiffs, in withdrawing their defense and assenting to the foreclosure, did so in view of the property considered as a whole. They did so with a view to the combined value of the real and personal estate. A railroad bed without' locomotives and cars is. but a vain and useless thing. Such a result was not in the contemplation of the parties, and cannot possibly be reached by any theory of complete justice.
One might, if necessary, go still further afield in search of a consideration for the oral contract. If the Statute of Frauds condemned this transaction, the plaintiffs would be entitled to have this consideration or its value back, by way of disaffirmance of the contract. There might be a difficulty in proving its exact value, but still, if the plaintiffs sought such relief, the courts would have to apply some principle to do them such inexact justice as was possible under the circumstances. What is meant is, had there been no oral contract, had Mr. Garrison purchased and then refused to fulfill, and had the plaintiffs no remedy in equity, they could still have demanded back the consideration which they had advanced, or its value. This capacity *293 of disaffirmance, under proper circumstances, was a valuable thing to them when the oral contract was made. If they gave it up to the defendant at his request, it was on general principles of law a sufficient basis for an express promise.
On the whole, I think that the contract evidenced by the letter was valid, and binding. It supplies an ample consideration for the oral contract, and is provable in this court, notwithstanding the Statute of Frauds either of New York or of Missouri.
But even should the defendant concede that correct results have thus far been reached, he will still say in substance, “ After all, the ‘ letter ’ practically amounts to nothing. There is no engagement by the defendant to buy. There is, at most, but a conditional contract to convey in a particular way, if he does buy, leaving the purchase to be made at Ms will and pleasure. The plaintiffs, too, were left at perfect liberty to purchase for themselves. The surrender of such a precarious claim, resting on the mere whim and caprice or good-nature of the defendant, cannot be a consideration for the oral contract. That agreement must accordingly be nudum pactum, and void for want of a consideration.”
I cannot agree with this view. The defendant had by his letter placed himself in a peculiar position. It is true that he was not bound to purchase the road ; still it was of the highest consequence that he should at the sale be free to form a judgment whether it was best for him to buy or not. In analyzing his position, it will be found that he was under this embarrassment; if he did not purchase, there might be no competition at the sale, and the property might be sold at a ruinous sacrifice; if he did purchase, all the benefits and advantages of the purchase would enure to the plaintiffs as stockholders, except that he would be protected as to his bonds. In signing the letter he had apparently *294 made a serious mistake. He was practically bottled •bp. Almost any clear-headed man would appreciate such an embarrassment, and would be glad to rid himself of it. If he could do this, he could so frame the new or modified contract as to reap a benefit beyond the value of the bonds from the future development of the road. The plaintiffs also were in a disagreement position. They could enforce the conditional contract in case the defendant did buy, but could not insist that he should purchase. They were at his mercy, unless he concluded to purchase. They were under pressure when he refused to carry out the terms of the letter. Still, in modifying the letter, they parted with something of value to themselves, and which might be, in case he should bid at the sale, of great moment to, the defendant. This was a sufficient consideration for the modification of the contract, or if one chooses to call it so, the surrender of the letter for the new and oral promise.
PART II.
The oral contract is now reached. It is set forth in the complaint in substance as follows :
In the month of June, 1876, the plaintiffs and one Denny, at the request of Garrison, surrendered the “letter” to him, and in consideration of the surrender, a modification of the agreement contained in the letter was made. The defendant promised the plaintiffs and Denny that, in case the Pacific road was sold under the decree of foreclosure, he would purchase it and would at once organize a successor company under the laws of Missouri, and would convey to the company all the property of the railroad purchased at the sale under the decree of foreclosure. The “successor company” was to have a capital divided into shares not exceeding $8,000,000 in amount. New bonds and a new mortgage were to be executed to the amount of $4,500,000, to-be *295 used in satisfaction and paying off the holders of the third mortgage bonds, or of the income and improvement bonds, as the case might be. Thirty-six thousand shares of the stock, at $100 each were to be issued to to the plaintiffs and Denny, equaling $3,600,000. The balance of the $8,000,000 stock to the amount of $4,400,000, was to remain with Garrison.
It does not appear on the complaint that this was an oral agreement, but it is conceded to have been oral by the plaintiffs. It is conceded that this contract was made in New York.
There are several questions that arise on the offer of this contract in evidence in this form.
I. Was this oral agreement a modification simply of the letter, and if so, is such a “ modification” of the written contract within the Statute of Frauds %
II. If the transaction amounts to a new contract, is it, so far as the real estate is concerned, governed by New York law, or by the law of Missouri, where the land is situated %
III. If governed by the law of Missouri, is it enforceable in New York ?
IV. If governed by New York law, is it in derogation of our Statute of Frauds \
V. If not enforceable at law in the New York courts, can it be upheld in equity on general principles ?
VI. If generally enforceable in equity, can it be enforced in this action upon the pleadings as they now are and without an amendment ?
VII. Is the rolling stock, etc., within the prohibition of the Statute of Frauds, and if so, has the action of the parties withdrawn it from the statute ? '
Division I.
I am of the opinion that the true version of this oral contract is that it is a modification of the “ letter.” The same general scheme pervades both contracts. The land *296 and other property are to be purchased at the foreclosure by Garrison. He is to transfer it to a “ successor company.” . The transferee is to issue bonds to the bond creditors, and stock to the plaintiffs. The oral contract differs from the letter in the fact that the former is an absolute promise and the latter is conditional ; the successor company is to be organized by Garrison instead of.by the plaintiffs; Garrison is to have stock as well as the plaintiffs. These variations do not appear to strike at the root of the “letter” and to entirely dispense with it as a contract. They rather seem to lpave the letter still in existence as a contract subject to the modifications made. If this be correct, the action must be assumed to be both upon the letter and its modifications, just as if a building contract in writing were subsequently modified by parol, the cause of action of any part aggrieved would be at one and the same time upon the written- instrument. and its modifications (American Iron Co. v. Eisner, 30 Super. Ct. 200).
This aspect of the case leads to an important inquiry : How far can an instrument, perfected under the Statute of Frauds, be modified by a subsequent parol contract 1
This question has been variously decided in the courts. The English cburts have taken different positions upon this subject. The early view was that parol evidence could be offered to show a subsequent modification of the written instrument. Cuff v. Penn, 1 Maule & S. 21. This proposition was retracted in the leading case of Goss v. Lord Nugent (2 Nev. & Man. 33), and subsequent cases to the same effect. There* the rule is established that where the contract is one which the Statute of Frauds requires to be in writing, and after it has been reduced in writing, new terms are agreed upon, such new terms must likewise be , reduced to writing, otherwise they cannot operate *297 to vary or rescind the original contract (See Marshall v. Linn, 6 M. & W. 109).
In several of the American States a different view prevails. Thus the Massachusetts court follows the rule of the older case of Cuff v. Penn, supra, holding that parol evidence is admissible to prove a subsequent oral agreement enlarging the time of performance of a simple contract or varying its terms, or to show a waiver or discharge although the original contract was required by- the Statute of Frauds to be in writing (Stearns v. Hall, 9 Cush. 31; Cummings v. Arnold, 3 Met. 486). The same general line of view prevails in in the Maine and Maryland courts. The New York courts have considered this question in Blanchard v. Trim, 38 N. Y. 227 ; Fish v. Cottenett, 44 Id. 542 ; Organ v. Stewart,* 60 Id. 419.
In Blanchard v. Trim, supra, the rule in Cuff v. Penn, supra, was recognized, the court saying the statute requires the making of the contract to be by writing, but it does not undertake to regulate its performance nor does it say that it shall not be varied by parol. That is left to be decided by the general rules of law and evidence. The case however, was decided on the ground that the principle was not applic-f able to the facts, as these did not show a modification or rescission of the original contract, but a resale or a new contract, pp. 227, 228. The rule is recognized in Fish v. Cottenett, 44 N. Y. 542. In Organ v. Stewart, 60 N. Y. 419, the present court of appeals, in considering a contract affected by the Statute of Frauds, says : “ It is not necessary to consider or to question the doctrine laid down in Cuff v. Penn, 1 M. & S. 21, and which has been followed or approved in several American cases (Cummings v. Arnold, 3 Metc. 486; Stearns v. Hall, 9 Cush. 31; Blanchard v. Trim, 38 N. Y. 227), *298 although overruled in England (Goss v. Lord Nugent, 2 Nev. & Man. 33, etc.) that a contract originally valid within the Statute of Frauds as being in writing may be modified as to the time or mode of performance by a subsequent oral agreement between the parties.” The court, however went upon the ground, in its decision, that the claim in that case was to engraft upon the contract a distinct and independent subject matter by parol, and that such a claim did not fall within the rule in Cuff v. Penn, supra. In the case at bar, no new term nor new interest in land is introduced. The main change is in the elimination of the contingent element in the “letter” and in the adoption of a new scheme for the distribution of shares of stock. However the rule of law may be on this point, I shall not rest the decision upon the matter before me now upon it, as it has not been argued. At a later stage of the cause it may receive more specific attention. An important suggestion, however, arises here. Assume that the oral contract is void, what effect does this have upon the “letter?” “A contract void by the Statute of Frauds confers no right and creates no obligation.” Dung v. Parker, 52 N. Y. 494. Assume that the oral contract is void, does not that leave the “ letter” in full force and effect? That was the point in Noble v.Ward, Law Reports, 1 Exch. 117 (a.d. 1866); S. C. in the Exchequer Chamber, 2 Id. 135.
The facts there were that the plaintiff made a contract in writing with the defendant for the sale of certain goods of more than £10 in value, at specified prices, to be delivered within a specified time. Subsequently, and before the time for delivery had arrived, a parol agreement between the parties was entered into, whereby the time for delivery was extended. The court held that the subsequent parol agreement was not good for any purpose under the seventeenth . section, and accordingly that the original contract *299 could l)e enforced. On application to the Exchequer Chamber, the same view was reiterated. The principle seems to be that the parties had, as it were, a conditional intent to modify the old contract by the new one —that is in case they could lawfully do so As it turned out that they could not legally make the modification, the old contract remained in existence, unmodified as before.
The defendant, by these authorities, seems to be in this dilemma : If the principle in Cuff v. Penn be correct, then the two contracts remain on foot, and the plaintiffs can recover upon them; if that case be not correct, and Goss r. Lord Nugent contains the sound rule of law, and the modifying parol contract is utterly void, then the u letter” remains the true contract. In either aspect of the case, the defendant would be liable to the plaintiffs in the one case on the letter alone, and in the other on the letter and oral contract combined, or perhaps the oral contract alone.
Division- II.
Is this contract, though made in New York, concerning lands situated in Missouri, governed by the New York Statute of Frauds \
The complaint states that Garrison agreed to organize a successor company under the laws of Missouri, and to convey to it the property of the road.
The company thus created would, as a matter of law, have its legal residence in Missouri, and could not hold meetings, pass votes, or exercise powers in another state (Angell & A. Corp. §§ 104,107). Accordingly, the conveyance to it must be accepted there. The conveyance is consummated by delivery and acceptance, or rather delivery cannot exist without acceptance (3 Washb. Real Prop. bk. 3, ch. 4, § 20 a). The place of acceptance is the place where the contract, in point of law, is made locus contractus Shattuck v. Mut. Life *300 Ins. Co., 7 Cliff. 151). Looking at the defendant’s contract, it is manifest that he agrees, as far as the con- > veyance is concerned, to perform the contract in Missouri by having an acceptance by the corporation there. By the same process of reasoning, the corporation issues the stock there, and so the plaintiffs are to be supposed to go there to receive. Of course, it might be shown affirmatively that a corporation chartered in Missouri had agents here, and thus performed acts here. This, however, is a case without any such proof, and the presumption must be that all the acts to be done by the corporation, when it comes into existence, are to be done in Missouri. This non-existent corporation had, of course, when the contract was made, no hand whereby to accept conveyances, issue shares, and the like. That capacity to act, if it ever exist, must exist in Missouri, when the corporate life is breathed into it. As no act is to be done which requires an agent in New York, all acts of performance must be presumed to be done in Missouri. Thus the question arises, if the law of the place of the making of the contract differs from the law of the place of performance, which is to govern % The point was fully considered in Dickinson v. Edwards,* 77 N. Y. 573 where it w'as held that in the absence of evidence of intent to the contrary, the law of the place of performance is tacitly" incorporated into the contract, pp. 581,582. Scudder v. Union Nat. Bk., 1 Otto, 406, does not establish anything to the contrary, through there maybe remarks in it not altogether consistent with Dickinson v. Edwards, p. 585. On p. 581, the court said that the rule that the law of the place of performance is to govern, is not merely a rule of interpretation, but operative, in an inquiry as to the validity, nature, and obligation of the contract (Citing Story Conft. L. % 280).
*301 Accordingly, it would seem that this oral contract is a Missouri contract.
At all events, as far as any interest in land is concerned, there must be a trust arising in Missouri where the land is situated. In other words, though it be conceded that New York is the place of the contract, and Missouri the place of the situs of the property, and the law of the two states differs, then the rules of the law of the situs must pravail over the law of the place of the contract.
This point has been alluded to in discussing the “letter” in a previous part of this opinion. It now presents itself more directly. The correct view, I think, is that the legislature of New York did not intend to make its Statute of Frauds apply to land interests in other states. They certainly did not mean to prescribe what sort of conveyances should pass land in other States, nor what kind of instruments should constitute mortgages or create easements elsewhere, nor, by parity of reasoning do they mean to enact what transactions shall amount to contracts creating interests in land in other States. On this subject, Siegel v. Robinson, 56 Penn. St. 19, is in point. It is there laid down that where a parol contract for the sale of land situated in Ohio was made in Pennsylvania, the Pennsylvania statute did not apply to land situated outside of the State. Undoubtedly, there are diverse theories upon this matter among the continental jurists, as there are among them upon'nearly every question arising in the conflict of laws. These theories are collected at great length by Mr. Justice Stoky, and display a wearisome and distracting diversity (Conflict of Laws, § 372 a, to § 372 f, 8th ed. 1883). After detailing the opinions of the foolish as well as of the wise with rigorous impartiality he goes on, in § 372 f, to give the rule of the common law in the following terms: “It seems very clear that a contract made in a foreign country for the *302 sale of land situated in England, Scotland, or America would not be held a binding contract in either of these countries to be enforced in their courts either in per. sonam or in rem, unless the contract was in conformity to the forms prescribed by those countries (citing §§ 362-365). ■ At the same time it is quite possible that the same contract might be enforced in the country where it was made if it should conform to the law of that country touching real property. But after all, looking to the great diversity of views among foreign jurists, there is much reason to be satisfied with the rule of the common law on this whole subject, that is, in respect to movables, the law of the place where the contract is made will, with few exceptions, be allowed to govern the form and solemnities thereof, but as ito immovables, no contract is obligatory or binding unless the contract is made with the forms and solemnities required by the local law where they are situated” (Story Conf. L. §§ 362 to 272 f).
This point was distinctly decided in Adams v. Clutterbuck, L. R. 10 Q. B. Div. 403 (a. d. 1883). The point there was, that under the Scotch law an instrument under seal is not necessary for creating in favor of one person a right of shouting and taking game over the = land of another. Such a right was in that case obtained; orally and sought to be enforced in England (where' a seal is necessary) in an action for damages based on the validity of the instrument. It was contended for the defendant that the requirement of a seal was a part of the lex fori and the contract could not be enforced in England. The court held the contrary, stating that the provision was a part of the lex loci. It said, “The provision regulates and was intended to regulate the transfer of interests in land, and unless there is compliance with the provision, the grantee takes no legal estate by the grant, quite irrespective of whether he is seeking to enforce the claim in a court of justice or not. *303 I cannot doubt that the provision therefore is a part of the lex loci and not of the lex fori. Suppose the laws in this case were reversed, and that according to the law of Scotland a seal was required, but according to the law of England no seal was required. The consequence would be that a person who had conveyed a right of shooting in a mode which gave no legal estate to the grantee in Scotland, could nevertheless sue in England on the contract as if he had really conveyed his right to the other party. This shows that the contention cannot be correct, and that the provision is part of the lex loci and not of the lex fori” (406). To the same effect is Doyle v. McGuire, 38 Iowa, 410.
The same argument is applicable to the case at bar. Reverse the law in this case, and make the contract void in Missouri by the statute and have no Statute of Frauds here. Then a transaction which would create no burden on the land in Missouri would fasten a trust upon it here. If there be a trust by the local law it is clearly enforceable in personam when the party is within the jurisdiction of the court (Gardner v. Ogden, 22 N. Y. 327). I am satisfied that though this oral contract was made in New York, the question whether it created an interest in land is to be solved by considering the law of Missouri.
Division III.
The true inquiry then is whether this contract, as far as the real estate is concerned, is void by the law of Missouri. In other words, as a matter of substantive law, was this contract void there. It will be remembered that in Missouri a non-compliance with the statute as to real estate does not make the contract void. It only declares that no action shall be brought upon the contract if not written. The meaning of this is, that no action shall be brought in the courts of that *304 State (Leroux v. Brown, supra). It is impossible for Missouri to prescribe the kind and number of actions, or the rules of evidence which shall be recognized in other States. , The rule is purely one of the lex fori and cannot affect the action of the courts here This subject has already been considered when examining the “letter.” The suggestions then made are deemed to be equally applicable to the oral contract.
Division IV.
Conceding that this contract, if it amounts to a contract of sale of lands, etc., is incapable'of enforcement whether by New York or Missouri law, it is still open to consideration whether any interest in land is contracted to be sold by the transaction.
(1) Garrison, the defendant, contracts to buy at a judicial sale from the master in chancery. This is not a sale within the meaning of the statute, which implies that the transaction should be between the parties to the contract (Browne Slat. F. 263 a, already considered while discussing the letter).
(2) The agreement to organize the company undei’ the laws of Missouri and convey to it, is not a sale in the statutory sense. It cannot be maintained in this contract at all events that a conveyance is to be made to a nominee of the plaintiffs.
The non-existing successor corporation was to be brought into being by the defendant’s exertions and mainly for his benefit. He was to control the bonds and the majority of the stock. Practically, he would'have had the control of the road, except that the plaintiffs were cestuis que trust of g minority of the stock. They' were, for all purposes of direction and management, at his-mercy. It is a clear abuse of terms to call this corporation with its obligations a “ nominee ” of the plantrffs.
But beyond this, there was no interest in the land *305 .created in favor of the defendant or of the plaintiffs. It is not necessary to elaborate this point as to the defendant, for I think no one would claim that an agreement to convey for his own benefit was a sale of land to him, within any ordinary signification of the word “ sale still it is true that he had a mortgage to secure his bonds, but that did not create an interest in the land by way of sale, nor did the plaintiffs have any interest in land. The shares, as was shown when discussing the letter, were not, on general principles of law an interest in land. None would have any interest in land except the corporation. But the new corporation, as such, paid no consideration and received no benefit. It was at most but a trustee, and as such it was under a duty to obey the law usually governing the acquisition of property in that character, i. <?., to carry out and execute the trust accompanying the transfer.
This whole transaction consisted in the surrender of the rights of the parties for the moment to receive them re-established in a new form upon the same property. Such a transaction is not within the Statute of Frauds (Cases already cited, also Cornell v. Utica, Ithiaca & Elmira R. R. Co., 61 How. Pr. 184, at Special Term; S. C. on appeal under name of Cornell v. King, 13 Weekly Dig. 327 [a. d. 1881]). This case, in its application to the equity branch of this subject, will be considered hereafter.
Pljt a very plain case here, stripped of all the special circumstances that exist here. Suppose a mortgagee and a mortgagor. The former fortieses a mortgage to which there is some plausible defence. To avoid litigation, he comes to an agreement with the mortgagor that he shall submit to a forelosure, and that the land shall vest in the mortgagor, who should execute a new mortgage for principal, interest, and costs. Would that be a sale ? Would it not be a mere con *306 tinuation of the relations of mortgagor and mortgagee % If the latter, what would be the character of the transaction, if the conveyance were to be made to a third person, who was to execute the proper mortgage and hold the title as trustee for the mortgagor, or, as in the present case, to a business corporation, with the mortgagor’s interest, represented by a minority of the shares of stock, and the mortgagee is entitled, under the arrangement to a majority thereof % If this be a sale of an interest of land to the mortgagor,, let us recast the phraseology of the law, so that words may be found to express an intelligible meaning. There is, however, no such rule of law. The correct version of the whole transaction is that the mortgagor, being under a legal duty to pay off the mortgage, he cannot rid himself of that obligation by a mere change in the form of the transaction. The duty attaches to the land. Thus it has been held that if he allows the land, to be sold for taxes, and he (the mortgagor), buys from the State, he still holds subject to the mortgage (Frye v. Bank of Illinois, 11 Ill. 367). He is regarded under such circumstances, as taking a roundabout method of paying the taxes. The equity of the. mortgage has always remained. I do not see why a similar principle is not applicable in this case, as between the parties to the contract. The plaintiffs and defendant were, in substance, mortgagor and mortgagee; they remain in the position of mortgagor and mortgagee at the end.
Just at this point it may be said, conceding that there is no sale in this oral transaction, yet the argument all along shows that a conveyance is to be made to the non-existing corporation, and that this institution is to have a trust imposed upon it, and this will be a declaration of trust, and that, by the Statute of Frauds, must be in writing. To any such claim as this there are sufficient answers.
In the first place, there is not a shred of pleading in *307 the defendant’s answer which calls up this branch of the statute. In the present state of the pleadings, I could not take this objection into consideration.
Again, even if this question could properly be raised, it must be noticed, that in this aspect of the . case, the defendant undertakes for the act of a third person. He agrees in substance that he will purchase and convey to the third person, and that it will do the act in question. If the third person does not do the act, he will be responsible in damages, as in the case of Beebe v. Johnson, (19 Wend. 500), where A. agreed with B. to perfect for B. a patent right in England, so as to procure for him, for the purposes in view, the entire control of Upper and Lower Canada. B. having sued A., he urged that as they were citizens of the United States, a patent could not be procured. The court held that this was no defense. On this principle, a refusal by the legislature of Missouri to incorporate the company would be no defence; the refusal of the company, if incorporated, to assume the obligations of the contract would be no defense. What the contract means is, that the defendant will warrant that the necessary acts shall be done by the persons referred to, or if not, that he will pay damages.
Still further, it may be said that the great object of the oral contract is to parcel out shares of the railroad company, subject to the mortgage. All the other acts are steps to the accomplishment of this purpose. Suppose that a railroad company should contract with a contractor to furnish wood from a particular wood lot convenient to the company for hauling. The agreement is that the contractor shall buy the lot, or some one else for him, cut down the trees, convert them into wood, and sell the wood to the company at a specified price per cord. Is that a contract for an interest in land within the statutes? Are not all these Intermediate acts ancillary and conducive to a sale of the *308 wood ? A contract to cut trees growing on the defendant’s land, and to deliver them in the form of logs to the plaintiff is not within the statute as an interest in land (Boyce v. Washburn, 4 Hun, 792). The same principle has been affirmed as to a contract to sell the growing fruit in an orchard, where the vendor agreed to pick the fruit and to deliver it in barrels to be furnished by the purchaser (Brown v. Stancleft,* 20 Alb. L. J. 55). Would it change the principle of these cases if the contractor not owning land had agreed to buy it, and then do the same things as were stipulated for in those cases ? There is a plain parallelism between those cases and this in the results : the plaintiffs there were to have saw logs or apples; here they are to have railroad shares, which are as clearly personal property, as the lumber or fruit. There is no trust in land created by this oral contract. The defendant simply enters into an executory contract that certain things shall be done which shall eventuate in the acquisition by the plaintiffs of thirty-six thousand shares of the stock of the railroad company. If the corporation had been organized, had received the title to the land, and had refused to issue the shares, the only proceeding against it would have been for shares, which, as has already been shown, are not an interest in land. The present proceeding, however, is not an action against the corporation. It is against the defendant on an executory contract for failing to supply the plaintiffs with the shares agreed upon. It seems to be substantially as if he had contracted to purchase the railroad and to see that the shares were issued, so that in considering his obligation one might omit from view the intermediate steps. The case resembles in its facts a cause decided in this court: Ludlow %. Van JSTess, 8 Bosw. 178. In that case A., having the title to land, *309 agreed with. B. that he would allow the agents of the latter to let and demise the land, and to receive the rents, and that, whenever requested by B., he would convey the land to any one by him designated, and would execute deeds accordingly, and would pay over to B. the proceeds of the sale. This arrangement was held to create no interest in the land in favor of B. The stipulations in favor of B. were treated as executory and resting wholly in action. It became necessary to decide this point, as B. was an alien, and the important inquiry was, whether the above fact created an interest in land. It. was held that they did not, and that there was neither equitable nor legal interest in land in B.’s favor, and that a conveyance by A. to a purchaser with full knowledge of the instrument would supersede the covenant in favor of B., or,any act under it (p. 193). It could not possibly have this effect if it were a contract for the sale of land, as it is an elementary rule that this can be enforced as against a purchaser of the legal title with notice.
The only difference between this case and the one at bar is, that in the former B. was to have the proceeds of a sale in cash, and in the latter the plaintiffs were to have value in shares. The contracts were equally executory, and the benefits received .under them were alike' personal property.
Division W.
But, independent of the validity of the oral xcontract, in a court of law, the facts of the case bring it within the jurisdiction of a court of-equity. The same general line of argument prevails here, as already set forth in discussing the “ letter,” and I refer again to Ryan v. Dox, supra, and the accompanying authorities. The defendant has had the whole consideration of the contract. He still holds and retains it. Under such circumstances he cannot set up the Statute of *310 Frauds in his favor on account of the legal or constructive fraud to be inferred from his acts. The case of Cornell v. Railroad, already'referred to, is quite in point, and may properly be added now to the authorities previously cited.
In this case, Cornell was a bondholder of certain first mortgage railroad bonds of the denomination of $1,000 to the number of 341. One King owned 946 of the same issue, and about 78 were owned by others, making a total issue of 1,365. The interest was not paid and a foreclosure was commenced.
An agreement was thereupon entered into between King and Cornell to the effect that the road should be bid in for the joint benefit of King and Cornell in proportion to their respective rights as holders of the bonds ; that a new company should be organized, and the property be conveyed to it, and such company should issue new first mortgage bonds to Cornell and King according to their respective interests in the old mortgage. On this agreement Cornell & Co. abstained from bidding at the sale, and King purchased the property. The new company was organized and had the title conveyed to it, and the question arose as to Cornell’s right inequity. The court held, at special term, that the Statute of Frauds had no application to the case. On appeal, it was held that the agreement was not void by the Statute of Frauds. The court said, that this case was to be distinguished from Levy v. Brush (45 N. Y. 58, 59), because both parties were interested in the land. In that case, neither party had any interest in the land at the time of the agreement. After citing Ryan v. Dox, supra, the court said, that its principle should apply as well where the purchaser makes a verbal agreement with the mortgagee as where he makes one with the mortgagor. Here the plaintiff (Cornell) was not legally mortgagee, but he was equitable owner of about five out of twenty-one parts of *311 the property. Unless the verbal agreemen t is carried out, the plaintiff will be defrauded of his rights in the property which he suffered King to buy (13 Weekly Dig. 329).
Every word of this arugment is applicable to the case at bar. There is an agreement here between the defendant and the plaintiffs, having an equitable right (as stockholders) in the property ; they abstain from bidding at the sale on an agreement with the defendant ; the land is sold substantially to the defendant; they will lose their rights if this court does not interfere.
The plaintiff’s case, however, is much stronger in his favor than that of Cornell v. King. They, with other stockholders, owned the whole of a valuable road, subject to a mortgage of doubtful validity. They surrendered its control, they allowed the mortgage to be validated, they reposed on the promise of the defendant, and he failed to fulfill his engagement. What-more meritorious case could be presented to a court of equity % The arguments of the counsel for the defendant in this cause only faintly attacked this aspect of the case. They, however, strongly urged that this action could not be maintained in its present form on . that theory. From this side of the case they elaborately discussed the theories of the “ Code of Civil Procedure,” and asserted in substance that the legislature had not abolished the distinction in actions between legal and equitable remedies; that they could not do so if they would, and further that to convert the present action into an equitable fiction would be to violate these principles.
Division VI.
Before discussing these questions, it may be well to consider whether an action to recover the value of these shares is an equitable action. The plaintiffs are suing for the value of thirty-six thousand shares of *312 stock. The defendant replies, “ You cannot have that on account of the Statute of Frauds, because you are claiming an interest in land as a basis for your action for the stock.” The plaintiffs say in turn : “We admit that now, for the sake of argument; but the interest in land is obtained by force of our payment of the consideration giving us an equitable interest, and your retention of the consideration makes you liable upon all branches of the contract.” Such parts of it as are remediable in equity will only be enforceable there ; such branches oE it as are naturally collectible at law will be enforceable there. Suppose that the defendant Garrison had made several distinct promises, and among others to supply each of the plaintiffs with a dozen bottles of champagne, would it be necessary to sue in eguty for that % Does not the nature of the thing to be done by him determine the court where the action should be brought % If the contract is withdrawn from the statute by equitable considerations, supplied by the plaintiffs, the acts of performance by the other party to the contract need not necessarily be equitable acts. They may be in their nature legal, and if so, they may perhaps be enforceable in a court of law.
This point was so decided in one branch of the case of Adams v. Clutterbuck, already cited for another point {L. JR. 10 Q.JB. JDiv. 403).
In this case the defendant became tenant to the plaintiff for three years, at an annual rent, of a furnished lodge and of the exclusive right of shooting and. sporting over certain lands in Scotland, and at the same time agreed on his part to leave a good breeding stock of game upon the ground at the termination of the lease. He took possession of and enjoyed the property for three years, but did not leave the breeding stock as he agreed to do. The plaintiff sued for damages for breach of contract.
*313 The court said that as the defendant had enjoyed the consideration he was liable upon his contract, and could not set up its invalidity under the Statute of Frauds as a defense to an action for the breach of the stipulation. It will be observed that the action here was on the contract. It was not for a rescission of the agreement nor for a return of the consideration, but on the contract itself for a breach of the stipulation sounding in damages. The correct theory of such cases seems to be this : the part performance by the plaintiff withdraws the contract from the operation of the Statute of Frauds, and supplies an equitable consideration for the defendant’s promise, whatever it may be.
It will be observed that this is not, as is frequently the case, an instance of part performance withdrawing-the case from the statute. It is the case of full performance. The defendant has the entire consideration and is enjoying it as in Adams v. Clutterbuck, supra. Why is not this equitable consideration a good basis for a legal promise ? So we are again brought around to the position that the nature and character of the act to be done by the defendant will determine the question whether he is to be sued in law or equity. If he has stipulated to perform a thing sounding in damages he can be sued at law; if to execute a deed or do other act enforceable in equity he can be sued in that court. The performance, by the plaintiffs creates the equitable right in them which serves to uphold the defendant’s promise. It is true that specific performance is the more usual relief; but specific performance is not a substantial right, but only a single remedy for an already existing equitable right. Rindge v. Baker, 57 N. Y. 218 ; S. C., 15 Am. R. 475. When. some other remedy is equally appropriate, there is no reason, either in logic or law, why that should not be resorted to. It will be observed that specific performance would *314 scarcely be an appropriate remedy in this case, since the defendant,, according to the plaintiffs’ evidence, purchased the land, organized the successor corporation, and had the land conveyed to it. What he failed to do was precisely this: to cause 36,000 shares of stock out of an issue of 80,000 to be issued to the plaintiffs under the conditions of the agreement. That is the foundation of their action. Why should “specific performance” be considered as the proper remedy in such a case ? Why should the plaintiffs not have the usual remedy when shares are stipulated for and not delivered, viz., an action for damages % The principle of Adams v. Clutterbuck, supra, seems to be perfectly sound and worthy of general recognition where facts exist, calling for its application.
The same principle is upheld in Martin v. Smith, L. R. 9 Exch. 50 (a. d. 1874). The facts there were, that the defendant took a written lease from the plaintiffs without a seal for a longer Term than three years, viz., for seven years, which was void under 8 and 9 Yict., c. 106, § 3. This statute is an extension of the old Statute of Frauds. In this written, unsealed instrument there was quite a number of things promised to be done by the defendant; such as to repair, paint, varnish and whitewash, etc., etc., at the end of the term. The defendant went into possession and remained till the close of the specified time, but did not repair. An action was then brought for damages. The court said that by the fact of his possession he became entitled to specific performance and was entitled to a lease, and that the agreement being capable of being enforced in equity, was a good consideration for the promises of the parties (see opinion of Kelly, ch. 13, p. 52). This is all that it is necessary to hold to make the defendant liable at law in this case, regard being had to the equitable right of the plaintiffs growing out of their acts of performance on their side, and their inability *315 to be restored to their original position as being the consideration for the defendant’s special promise. See also Murtha v. Curley,* 12 Abb. N. C.12; S. C., 90 N. Y. 372, as an instance of an action on equitable grounds for money. While I would be willing to place my decision upon this ground, I propose, however, to consider the objection of the defendant more directly, and to inquire whether, assuming that the defendant is only liable in equity, this complaint cannot be sustained as an equitable action.
As the counsel for the defendant laid great stress upon the question, it will be considered with some care.
The whole question narrows itself to a matter of pleading under the Code of Civil Procedure. The claim of the defendant substantially is, that the plaintiffs have not so drawn their complaint, that under its language they can prove a cause of action of an equitable nature arising out of this transaction, but must confine themselves to a claim at law, and if they have no claim ál law, all evidence of this contract must be excluded, unless an amendment is allowed. Whether such an amendment is to be allowed would naturally be considered, they argue, hereafter.
Stripping the question of all verbiage, the point is substantially this : “ Admit this contract to be void at law, but good in equity by reason of acts of performance on the part of the plaintiffs, you, the plaintiffs, cannot prove your equitable rights in the present condition of the pleadings.”
If this proposition of law is sound, it is highly technical, and clothes the Code with the severe aspect of the rules of ancient pleading.
In considering this view, I am met by a great rule of statutory construction, applicable to the whole *316 subject of pleading, as follows,'Code Civ. Proc. §519 : “Theallegations of a pleading must be liberally construed with a view to substantial justice between the parties.” One of the cardinal rules of construction of written language is, that if there be two possible and rational constructions, one of which would make the paper nugatory and of no effect, and the other would make it effective, the latter must in general be adopted. By the hypothesis of the defendant, if this pleading be considered as setting forth a cause of action at law, it is nothing. It is a legal absurdity on the part of the pleader having knowledge of the evidence in the case. I am accordingly bound, under this rule, to give it the most favorable construction, for the purpose of doing substantial justice between the parties. This doctrine inverts, the old rule of pleading to the effect that every intendment must be made against the pleader, and establishes the more satisfactory rule that every reasonable intendment must be made in his favor.
The great rule underlying all modern code-pleading to which the foregoing principle of construction is to be applied, is to state “the facts constituting the cause of action.” This statement of facts does not include the reliefsince the appropriate section (Code Civ. Pro. § 481) provides that the pleader is only to demand the judgment to which he supposes himself entitled. This supposition or hypothesis cannot of course be a fact—it is only an opinion, and he may of course err in his opinion. The only serious consequence seeming to flow from an erroneous opinion as to the judgment to which he is entitled, is that provided in section 1207, which is that if there be no answer, it shall not be more favorable to the plaintiff than that demanded in the complaint. Where there is an answer, the court may permit the plaintiff to take any judgment consistent with the case made by *317 the complaint and embraced within the issue. If I "understand this legislation, it is that the demand for judgment is no part of the case in a litigated question upon issue; but if there be a non-litigated claim, the plaintiff is to be confined on rendering judgment to his demand. The manifest object is to do complete justice between the parties where they both have an opportunity to be heard, without reference to any error in the plaintiff’s theories when he served his complaint. But if there be no true hearing of the case, the plaintiff should be limited to his hypothesis, for that is all the absent defendant would naturally be led to expect. This view leads to the important conclusion that at least in a litigated cause the demand for judgment is no criterion of the nature of the cause of action.
The only inquiry then seems to be, does the complaint contain the requisite facts ? These facts may be called for convenience either equitable facts or legal facts. If the cause of action is a legal one, then there must be facts enough stated to bring it within the rules of law constituting the legal cause of action.
The same facts may also constitute an equitable cause of action, and thus be also equitable facts. It would seem then to be within the option of the plaintiff to have his choice between an equitable and a legal judgment. He plainly could not .have both where the remedies would be inconsistent. An illustration is, a contract for the sale of land made in pursuance of the Statute of Frauds. The pleader may demand in such a case either a judgment at law for damages or in equity for. specific performance. In other , cases there may not be enough legal facts to constitute a cause of action, but the addition of one or more may constitute a claim in equity.
It is the group of facts, taken together, that either *318 constitute legal facts and so make a valid claim at “law,” or which, similarly considered, constitute equitable facts, and so make up an equitable cause of action. Assume, for example, an imperfect statement in the complaint, the addition of one or more facts may make up a legal group, and thus constitute a claim at law, or the addition to the same original imperfect statement of some different fact might make up the equitable group and make the case cognizable in equity. Thus, for example, if all the facts constituting a contract for the sale of land are present, except the fact that it is in writing under the statute, we have not sufficient- to make a case at law, but if we add to this same statement that the vendor has received the consideration which he cannot restore, the whole statement constitutes the necessary equitable facts to give an equitable cause of action.
If in any pleading there are not enough facts to make an equitable cause of action, the cause cannot logically go forward in that aspect if proper objection be made. If it could, pleadings would be useless. The only way to proceed consistently with any show of reasoning would be by some method of amendment, whereby the necessary facts are inserted. The office; of an amendment would thus seem to be, either by • the action of the pleader or of the court, to put the' complaint in the same condition that it would have been in if the proper facts had been inserted at the outset. If this cannot be done, either because the absent requisite fact does not exist, or because the rules governing amendments do not admit of its being supplied, the case fails for want of sufficient statement of facts. In no case, where the facts are sufficient can the case fail or its progress be impeded, if it be at issue, by reason of an erroneous opinion of the pleader of the legal consequences that should follow from his facts, e. g., by demanding an unsuitable judgment. On this point the remarks of the court in Beck v. Allison, *319 * 56 N. Y. 372, are to be noted. The court held that the plaintiff, having no equitable cause of action, the demand for equitable relief, viz., cancellation of a lease, was wholly immaterial. This rule is stated with great emphasis in Murtha v. Curley, 12 Abb. N. C. 12 ; S. C., 90 N. Y. 377. It is there said that “a plaintiff is not to be turned out of court when an answer has been interposed because he has prayed for too much or too little, or for wrong relief.” A demurrer will not lie to an erroneous prayer for judgment. Covert v. Henneberger, 53 How. Pr. 1.
These principles may now be applied to the present case.
It is now assumed that there are not enough facts in existence to make a legal cause of action. The nonexistent fact for this purpose is the absence of a writing. Are there still enough facts stated to constitute an equitable cause of action ?
The rule commonly laid down by courts of equity, is, that where a plaintiff in equity seeks the specific performance of an oral agreement, having no writing, but relying upon the peculiar power of a court of equity to enforce his claim, he should specially allege all the equitable circumstances existing in his case, such as part performance and the like, upon which he intends to rely to avoid the bar of the statute, and to give the court jurisdiction (Browne Stat. F. § 507, Small v. Owings, 1 Md. Ch. Dec. 363 ; Hart v. McClellan, 41 Ala. 251). Mr. Browne proceeds, “According to the system of equity pleading which once prevailed, it would have been sufficient for the plaintiff to allege the agreement, and then if the defendant pleaded the statute, he might specially reply the equitable circumstances to meet that plea. Now that special replications in equity are practically abolished, and tlae *320 amendments to the bill after plea or answer have taken their place, the method above suggested appears to be uniformly pursued.” He adds: “It does not appear to have been ever decided that acts done in part performance of the agreement must be expressly alleged to have been so done, but such is the common and probably safer course. The question of the sufficiency of what is alleged to warrant a decree for specific performance will be raised by demurrer to the bill” (Citing Wood v. Midgley, 5 De G. M. & G. 41).
Mr. Browne here speaks with much caution. I am willing to hold positively that the requisite equitable facts or circumstances must now appear on the complaint either through the statements of the pleader or by amendment. The remaining inquiry then is, do they so appear ?
The great and leading requisite equitable fact is that the party seeking to enforce the contract has done certain acts in part or full execution of the contract or upon the faith of it, with the knowledge or consent of the other party. These acts must be of such a nature as that a denial of rights which the oral contract purported to confer would be an infliction of an unjust and unconscientious injury and loss. In such a case the opposite party is assumed to have misled the party performing the acts to his harm, and thus to be estopped from setting up the Statute of Frauds (Glass v. Hulbert, 102 Mass. 35). Under this rule nothing is to be regarded as performance so as to constitute a sufficient equitable circumstance which does not put the party performing it in such a position that a fraud will be allowed to be practiced upon him if the contract is not enforced. The fraud here intended is not in the malcing of the contract, but in the refusal to carry it out in the presence of the equitable circumstances. An important instance is where the claimant has on the faith of the contract put' himself in such a condition *321 that he cannot, if the contract goes for nothing, be restored to his original position (Story, Eq. Jur. §761; Browne Stat. of F. § 463; Rhodes v. Rhodes, 3 Sandf. Ch. 279; Malins v. Brown, 4 N. Y. 403).
I think that all the necessary equitable circumstances are within this rule stated in this complaint. The contract is alleged and then action upon it by the plaintiffs. It is alleged that they withdrew their opposition to the foreclosure in consideration of Garrison’s agreement, and that by their action he was enabled to procure a judgment and decree of foreclosure and a sale, and that without the plaintiff’s co-operation and consent such a decree would not have been made either at all or until after a trial by the court, the result of which trial was in doubt.
Here is a sufficient allegation of a consideration, and it needs no reasoning to show that if this court shall hold this contract to be void, the plaintiffs cannot be restored to their original position. If the contract is void both in law and equity, as it must be unless these equitable circumstances can now prevail, no possible mode is open to the plaintiffs whereby they can reinstate themselves in the place they were in on the day before they had agreed that Oliver Garrison might be appointed receiver, and while the foreclosure suit was still pending. If these be not “ equitable circumstances,” I do not know what would be.
No case has been cited, nor, as far as I know, does any exist, which would debar a recovery on such a complaint as this, simply because the demand for judgment was inaccurately drawn, if that be the case here. The cases of Reuben v. Joel, 13 N. Y. 488; Gould v. Cayuga Co. Nat. Bk., 86 Id. 75;* Stevens v. Mayor, &c. of N. Y., 84 Id. 296,† do not affect this case un *322 favorably. All that Reuben v. Joel, supra, holds is, that a court of equity is not authorized, in case of a sale fraudulent as to creditors, in an action by a simple contract creditor against the debtor and his fraudulent vendee, to restrain the latter from disposing of the property. The difficulty was that there were no equitable facts or circumstances in the case, and it falls - within the line of reasoning already suggested. The opinion of Judge Selden must be read from this point of view. Stevens v. Mayor, &c. of N. Y., supra, makes the question turn upon the presence of equitable facts also, and holds that the court will give the relief to which the facts entitle the plaintiff, whether legal or equitable, the relief being consistent with the case made by the complaint and embraced within the issue, citing Code of Civil Procedure, § 1207. This is precisely what has been maintained in this opinion. Gould v. National Bank, supra (a case on which the defendant most strongly relies), seems to me to be governed by the same principle as the other cases. Closely considered, it will be found that the element wanting to make it a case in equity was quitablefacts or circumstances. The action was brought as an action at law, no mention being made in the complaint of the compromise agreement or of the $25,000 paid to the plaintiff (p. 83). A purely legal defense was set up; it was tried as an action at law, and no motion was made to convert it into an equity action. It was an action to recover damages for fraud. An effort was made to treat it as an equitable action to rescind the contract on the ground of fraud: The equitable circumstance was wanting in the complaint of an offer to return what had been received under the contract. The case is plainly reconcilable with the others cited.
There is but one thing more that it would be possible to insert in the complaint, considered as an equitable action. - The plaintiffs might have stated that this *323 contract was oral. It could not have been necessary to do this, since the complaint would have been equally good in equity, whether oral or written. It cannot accordingly be regarded as one of a series of facts “ constituting the cause of action.” The constitutive facts are in no respect weakened either by the presence or absence of such an allegation.
The defendant, however, says that the demurrer to the complaint decided in the Court of Appeals (Marie v. Garrison, 83 N. Y. 14), was argued as though the case were an action at law, and was so treated by the court of appeals, and that it is too late now to treat it as an action in equity. I do not perceive the force of this objection. The demurrer only decides what appears on the face of the complaint. It did not appear that the contract was oral. The court decided, we may assume, that the contract being not apparently obnoxious to the statute, was valid in other respects. They did not, and apparently could not, decide the question whether, if the facts were that there was no writing, there were not enough facts in the complaint to constitute an equitable cause of action.
The true view is that this complaint must now be regarded as though it had never been demurred to. When a demurrer to a complaint is overruled, with leave to the defendant to amend, and he avails himself of the leave, and serves an answer raising an issue, the case must be regarded as though no demurrer had been interposed. The demurrer is out of the case, and is not available to either party for any purpose (Wheelock v. Lee, 74 N. Y. 495, 499). It would seem from this decision that other questions upon the sufficiency of the complaint might be discussed at the trial beyond those which were raised at the demurrer. Accordingly, even if this case was treated on the argument of the demurrer as one at law, there is nothing to prevent, on the trial of the issues in the complaint and answer, from *324 considering the complaint and answer together, and determining whether the complaint cannot be sustained as an equitable cause of action.
After all, it may turn out that “specific performance” would not be a practicable remedy in the case. The defendant may not have the power to perform or to cause performance. It may turn out that he has no pecuniary interest in this railroad. In that case, the" plaintiffs might be obliged to pontent themselves with damages, even though, if he had been owner, they might have a trust in the land, as in the case of Hart v. Ten Eyck* (2 Johns. Ch. 62). Such damages might be designated as “ equitable.” Would it be necessary to call them so in Code pleading % I think not.
It has not been considered important in this discussion to dwell upon the' acts of the defendant showing a breach of duty in the way of performance of the contract. These will be more appropriately discussed at a later stage of the action, when the question of performance will naturally arise. It is proper to remark that the defendant, by telegrams to the plaintiffs at about the time of the sale, announced that he was absolved from the obligations of the contract by the fact that others had bid beyond the limit, which he had set for his own bid. The plaintiffs, by counter telegrams, insisted on the continuance of his liability. The evidence of the plaintiffs shows that his engagement to purchase was absolute. Assuming that to be the case, no act of another person bidding at the sale would release him. He had bound himself in substance to acquire the property at all events (Harmony v. Bingham, 13 W. Y. 99, † and kindred cases).. It is immaterial, if this be an action at law for damages, whether he bought the property. He must in some way provide the shares *325 for the plaintiffs. If the action be in equity, if he acquire the property either at the sale by collusive acts with others, who were but nominal bidders, or by subsequent purchase, even for value, he would still be a trustee for the plaintiffs. An agreement to do executory acts either as to land or personal property, not at the time acquired, becomes binding when the acquisition is made (McCaffrey v. Woodin,* 65 N. Y. 465-467, and cases cited; Holroyd v. Marshall, 10 H. L. Cas. 191 ; Wisner v. Ocumpaugh, 71 N. Y.113).
I think, however, that the testimony shows that the bid of the other party at the foreclosure sale (the Pierce party) was ineffective, and that they could not have made up the bid without the aid of the defendant, and that he was the efficient cause of the purchase by them. In equity and good sense, he was the purchaser.
Suppose that I should dismiss this complaint on the ground taken by the defendant. The plaintiffs would then serve another complaint containing precisely the same facts as now, only varying the demand for judgment. It has already been shown that this is not in its nature a constitutive fact, and is not so treated by the Code. The result would be that the complaint would be dismissed, although the pleader did state the facts constituting the cause of action. I cannot think that the Code requires from the courts such a piece of self-stultification. It seems clear from Beck v. Allison, 56 N. Y. 366, that an equitable circumstance, not stated in the complaint, may be introduced by way of amendment at the discretion of the court. I do not think an amendment is necessary in this case.
Division VI.
As to the personal property, locomotives, cars, etc., but little need be said. For reasons already given, I *326 deem this to be a Missouri contract, that being the place of performance. It is not very material which it is, in this connection, since the provisions on this subject are practically the same in the two States. The words in the Missouri statute that the contract 1' shall not be allowed to be good” unless the statute is complied with, are equivalent in meaning to the word “void” in the New York statute.
It is unnecessary to repeat in this connection the arguments used when discussing the “letter” to show that there was no sale of ‘£ goods, wares, or merchandise,” or of “goods, chattels, or things in action.” There was no sale of the goods themselves as between the plaintiffs and defendant. The third mortgage under the Missouri statute making locomotives, etc., personal property was probably a chattel mortgage. If the transaction had been completed there would still have been a chattel mortgage, but that would have been in the interest of the defendant. All that the plaintiffs would have received would have been shares of stock, which, of course, are things in action. Still, there would have been no sale to them of the shares since no price was fixed in money. Nor were any shares in existence to be sold.
The law of this State is, that when an article is not at the time of the contract in existence, but is to be created or produced or manufactured and then delivered to the so-called vendee by the vendor, the transaction is not a sale. It is sometimes termed a contract for “labor and materials.” It is not necessary to characterize the transaction by that particular name. It may be a contract for mere services in producing and supplying the subject matter of the contract, as in this case. The subject of this contract being an immaterial product, there is no element but services, on the part of the defendant. The principle involved in the case is established by such decision as Mixer «. How *327 arth, 21 Pick. 205; Higgins v. Murray, 73 N. Y. 252; Parsons v. Loucks,* 48 N. Y. 17, 19 ; Goddard v. Binney, 115 Mass. 450. This last case states the rule as follows : “A contract for the sale of articles then existing, er such as the vendor in the ordinary course of business manufactures er procures for the general market, whether on hand at the time or not, is a contract for the sale of goods to which the statute applies. But, on the other hand, if the goods are to be manufactured especially for the purchaser, and upon his special order and not for the general market, the case is not within the statute.”
I think that the court of appeals, in Higgins v. Murray, supra, adopts the last branch of this rule. The facts of this case are clearly within it. The stock had no existence when the oral contract was made. It was to be brought into existence by the act of the defendant. Every step in creating the stock was to be taken by him or his instrument. It is not too strong an expression to say that the stock was to be “manufactured” by him—:to be the product of his money, brain, and agency, as much as the new carriage, with its drab lining, cane seat, inscribed monogram, and owner’s initials, were the work of Goddard, in the case of Goddard v. Binney, supra. The New York cases are certainly not mere favorable to the defendant’s contention than those in Massachusetts, as shown in a long array of cases, such as Cruikshank v. Burrell, 18 Johns. 58; Sewell v. Fitch, 8 Cow. 215 ; Robertson v. Vaughn, 5 Sandf. 1, as well as those already cited.
I have only to add that I reaffirm in this connection what was said in discussing the “letter” and the real estate branch of this subject, that this is a compound contract. It does not treat the land as a subject of sale, or the goods as a subject of sale, but groups the *328 two together as a mass, and then provides for shares, which are neither lands nor goods, hut rest upon both, depend upon both for their validity and vitality. Accordingly, if the Statute of Frauds is applicable to the locomotives and cars, yet as the acts of performance have in equity withdrawn the land from the operation of the statute, they have also withdrawn the goods, as shown in the case already cited of Smith v. Smith (14 Vt. 440).
I ought, perhaps, to apologize for the extraordinary length of this opinion. I shield myself under the fact that the discussions of the counsel were voluminous and many sided, and that a number of the questions at issue were new and somewhat difficult. It is a satisfaction to know that if I have erred in any material respect, the error can be readily corrected by the appellate courts.
On the whole, the motion to exclude the evidence is denied.*
*334 Note on Actions to Establish a Trust.
The necessity of these actions generally arises first, either, in the case of express trusts, from lack of, or defect in, a declaration of trust, or a denial of its validity or'its acceptance.
Or, second, in case of intentional trusts, which have not been in anywise evidenced by writing (and which, therefore, according to the usage of some writers and courts, are not deemed within the category of express trusts); in which class of cases, the action rests upon a theory that a trust was intended by the parties, but is to be inferred from circumstances.
Or, third, resulting trusts, which is the term technically appropriated exclusively to the case of that kind of trusts yhich was raised by courts of equity, from the fact that one person had obtained legal title by a consideration proceeding from another; and in this class of cases the trust usually has to be proved, not only without a written declaration, but in apparent contravention of the written title.
Or, fourth, constructive trusts, under which general term are included those cases where a court of equity will fasten upon property the quality of a trust or charge the holder of it, with the duties and liabilities of a trustee, irrespective of the questions whether he intended to assume a trust or not; or whether the other party intended to confide a trust in him or not.
It is obvious that there must be many cases, where, from the ignorance or incapacity of the plaintiff, or the uncertainty or inaccessibility of the evidence, the pleader cannot determine in advance of the production of evidence upon the trial, whether the trust was an intentional trust or a trust ex maleficio ; falling under the last class called constructive trusts.
Under the new procedure, it is not necessary to determine this question in advance, but the plaintiff may allege the circumstances of the case, and succeed if he either proves circumstances from ¿which the law will infer that the defendant intended to act in the capacity ' of a trustee, or from which, upon settled principles of equity, it may be held that he is chargeable as trustee, even against his intention.
The principal legal obstacles met with in cases of either class are:
First, the provisions of the statute of frauds, which require trusts • and transfers of interest in land, to be evidenced by writing. The New York statute is as follows:—
“No estate or interest in lands, other than leases for a term not exceeding one year, nor any trust or power, over of concerning lands, or in any manner relating ..hereto, shall hereafter be created, granted, *335 assigned, surrendered or declared, unless by act or operation of law, or by a deed or conveyance in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same, or by his lawful agent, thereunto authorized by writing.” (1 R. S. 134, § 6; same stat. 3 R. S. 7 ed. 2326.)
But this section is not to be construed “to prevent any trust from, arising or being extinguished, by implication or operation of law; nor to prevent any declaration of trust from being proved by any writing subscribed by the party declaring the same.” (Id. § 7.)
“Every grant or assignment of any existing trust in lands, goods or things in action, unless the same shall be in writing, subscribed by the party making the same, or by his agent lawfully authorized, shall be void.” (1 R. S. 137, § 2; same stat. 3 R. S. 7 ed. 2329.)
Second. The second obstacle consists of the provisions of the ' Statute of Trusts as adopted in the State of New York, and in some other States, abolishing express trusts in real property, except (aside from special provisions as to certain corporations) for the following purposes: “to sell lands for the benefit of creditors; to sell, mortgage or lease lands for the benefit of legatees, or for the purpose of satisfying any charge thereon; to receive the rents and profits of lands, and apply them to the use of any person, during the life of such person, or for any shorter term, subject to the rules prescribed as to the creation or division of estates in land; or to receive the rents and profits of lands, and to accumulate the same, for the purposes and within the limits prescribed by the statute. (1 R. S. 728, §§ 45, 55; same stat. 3 R. S. 7 ed. 2180, 2181.)
Third. A third obstacle is found in the provision of the statute adopted in New York, and in some other States, to abolish resulting trusts, such as were raised by courts of equity, upon the circumstance that one person paid the consideration for a conveyance to another. The N. Y. statute is as follows (Id. § 51):
“ Where a grant for a valuable consideration shall be made to one person, and the consideration therefor shall be paid by another, no use or trust shall result in favor of the person by whom such payment shall be made; but the title shall vest in the person named as the alienee in such conveyance;” with an exception in favor of the creditors of the person making payment (§ 52), or “ where the alienee named in the conveyance, shall have taken the same as an absolute conveyance in his own name, without the consent or knowledge of the person paying the consideration, or where such alienee, in violation of some trust, shall have purchased the lands so conveyed, with moneys belonging to another person.” (§ 53.)
Fourth and lastly, the plaintiff often has to meet the general prin *336 ciple of evidence, that it is not competent to adduce oral evidence’ for the purpose of contradicting or varying a written instrument.
The case in the text is a very full and instructive discussion of the effect of the statute of frauds as an obstacle to an action for the establishment of a trust; and it is not necessary to add anything further here, on that point, in addition to the cases cited in connection with the head-note.
The clauses, in the statute (§ 6), which except trusts created “by act or operation of law;” or (§ 7) “ by implication or operation of law,’’ are intended to include that large class of cases where there is something in the relation of the parties, existing prior to the transfer or acquisition of title, which equity can fasten upon as the foundation of a trust, in order to prevent what otherwise would either be a fraud or would operate (however innocently) as if it were a fraud.
The strongest instances in this class of cases are those where a person, who is the trustee of an express trust, in itself sufficiently manifested to satisfy the requirements of the statute of frauds, conveys the property as trustee, and acquires it in his individual capacity; or in any way so deals with it as to claim it himself adversely to the trust; or where, with trust funds, he purchases property, taking title in his own name.
In these classes of cases, it is very clear that neither the statute of frauds nor the statute as to resulting trusts, constitutes any obstacle ■to charging him, as trustee, upon parol evidence. And it is equally settled by the courts, that the rule excluding extrinsic evidence to vary a writing, does not.
This principle, of a trust arising from a pre-existing, fiduciary capacity, applies to agents, attorneys, auctioneers, joint adventurers, partners, officers,—public and corporate—and, to some degree, to medical and spiritual advisers, husbands and persons standing in very intimate relations, by virtue of which they are entrusted with the management of or title to property, or have a peculiar influence upon its disposition.
On the other hand, a stranger who stands in no such relation, will not by any verbal declaration of trust made in the very transanction in which he is intrusted, constitute himself a trustee, unless there be circumstances of positive fraud, mistake or other ground of equitable relief.
It is plain that between these two classes of cases, there will be found a large.debatable ground; such, for instance, as the numerous cases in which a friend attends the judicial sale of a debtor’s property,, under a promise to buy in the property for the debtor’s benefit. Here is one instance (involving the principle seen in a large variety of cases) *337 —see Dodge v. Wellman, 1 Abb. Ct. App. Dec. 512, and cas. cit.; aff’g 42 Barb. 390,—where it is sought to establish a trust by parol evidence, without the aid of any pre-existing fiduciary relation.
The practical suggestion of chief importance, arising from these principles is, that in an action to establish a trust, the plaintiff’s attorney should consider, very carefully, first, every detail of evidence in writing, manifesting the trust, the more if there was no writing creating the trust; second, every circumstance tending to show a fiduciary relation of any kind or degree, previous to the transaction in question, such as can be regarded in any sense as its foundation; and, third, in the absence or -weakness of these evidences, circumstances indicating fraud or mistake, such as may be a ground of equitable relief.
The following cases will afford the reader a convenient clue to the varying phases which such actions present and the principles, which, amid much diversity of opinion, the courts have with tolerable consistency applied.
1. Requisites of a written declaration of trust.] It is a principle well settled in equity, that a trust need not be created in writing. It is sufficient if it is proved in writing under the hand of the party to be charged. To take the case out of the statute of frauds, the trust must appear in writing, under the hand of the party to be charged, with absolute certainty as to its nature and terms, before the court can undertake to execute it. The nature of the trust, and the terms and couditions of it, must sufficiently appear, so that the court may not be called upon to execute the trust in a manner different from that intended. Steere v. Steere, 5 Johns. Ch. 1, 11.
A trust cannot be declared by parol, but it may be created by any writing which shows that a trust is intended, without using any particular form of words; a letter or memorandum may be sufficient. In a case where the deed to the trustee described him as trustee, and a mortgage was subsequently made to him and the plaintiffs by the cestui que trust and in an agreement in respect to the land, he described himself as agent, this was held sufficient to show that he was a trustee and that it was a naked trust. The cestui que trust was a foreign corporation. Brown v. Combs, 29 N. J. L. (5 Dutch.) 36.
For other cases and an exposition of the settled rules as to declarations of trust, see Abbott's Trial Enid. p. 223.
2. Trust arising by implication of law from a previous fiduciary relation.] In a recent case the court of appeals, after saying that the statute does not include implied trusts or those arising by operation of law, in the prohibition, of parol evidence, add:—This statute does not preclude a party from establishing any implied or resulting trust known or recognized by the common-law. They arise usually from the acts or relation of the parties to the property involved, and not *338 upon parol agreements. The principles of equity and good conscience applied to certain situations and acts of the parties, are used to raise presumptions of intention, and to impress property with trusts, and to clothe one party with the character and obligations of a trustee, and another with the rights and privileges of a cestui que trust, for the purpose of securing honesty and fair dealing among mankind, and to prevent fraud and injustice. The statute referred to was never intended to interfere with the application of their equitable and benign principles; but it was designed to prevent frauds and perjuries by prohibiting the creation of trusts relating to real estate, dependent solely upon mere verbal or parol conversations or agreements.1 Foote v. Bryant, 47 N. Y. 544; aff’g Foote v. Foote, 58 Barb. 258.
There are a great variety of cases where implied resulting or constructive trusts have been declared, which it is unnecessary to enumerate ; .but to none of them has the statute of frauds any application. (Perry on Trusts, §§ 125 to 168; Lewin on Trusts, 115, 157.) The transactions out of which a trust of this character arises may be proved by parol, but the trust itself must rest upon the acts or situation of the parties as proved, and not merely upon their declarations.. The statute embraces only trusts which are created or declared by the, parties (Perry on Trusts, § 137, and cases there cited). Foote v. Bryant, (above.)
It is a general principle that trustees (unless they are nominally such to preserve contingent remainders),—agents, commissioners of bankrupts, assignees of bankrupts, solicitors to the commission, auc-f tioneers, creditors who have been consulted as to the mode of sale, or any' persons who, by their connection with any other person, or by being employed or concerned in his affairs, have acquired a knowledge of his property, are incapable of purchasing such property themselves, except under certain restraints. Michoud v. Girod, 4 How. U. S. 503, 554.
For the application of this principle see, as to Administrators, Riddell v. Roll, 24 Ohio St. 572.
Agents, Willink v. Vanderveer, 1 Barb. Ch. 599; Cave v. MacKenzie, 46 L. J. Ch. 564; Oldham v. Jones, 5 B. Mon. 458.
Assignees in trust, Exp. Moore, 45 Law Times, N. S. 558; Jenkins v. Eldridge, 2 Story, 181.
Attorneys, Mason v. Ring, 3 Abb. Ct. App. Dec. 210; Walker v. Walker, 101 Mass. 169; Dyer v. Shurtleff, 112 Id. 165; Manning v. Hayden, 5 Sawy. 360; Re Taylor Orphan Asylum, 35 Wisc. 534.
Auctioneers, Campbell v. Swan, 43 Barb. 109; 8 South. Law Rev. N. S. 566.
Brokers, Woodhull v. Osborne, 2 Edw. Ch. 615.
Commissioners to sell, Roberts v. Roberts, 65 N. C. 27.
*339 Corporate officers, Twin Lick Oil Co. v. Marbury, 91 U. S. (1 Otto) 587; Buell v. Buckingham, 16 Iowa, 284; and other cases cited in N. Y. Daily Reg., June 4th and 12th, 1879; Martinson v. Clowes, Chan. Div., June 1882, 30 Weekly Rep. 795.
Creditors, compare Campbell v. Pennsylvania Ins. Co., 2 Whart, 53, with 2 Add. on Contr,
Executors, Davoue v. Fanning, 2 Johns. Ch. 252; People v. Open Board of Stock Brokers Building Co. 92 N. Y. 98; Phillips v. Terrell, 10 Heisk. (Tenn.) 417.
Guardians, general or special, Dodge v. Thompson, 13 Weekly Dig. 104; Dodge v. Stevens, 44 N. Y. 209.
Heirs holding in common, Ludlow v. Maxwell (Ky. July, 1882), 4 Ky. Law Rep. 55.
Joint adventurers in a purchase or enterprise, King v. Wise, 43 Cal. 628; Flagg v. Mann, 2 Sumn. 485.
Mortgage, Martinson v. Clowes (Chan. Div., June 1882), 30 Weekly Rep. 795; Dyer v. Shurtleff, 112 Mass. 165.
Partners, Fairchild v. Fairchild, 64 N. Y. 471.
Purchases with trust funds, Robinson v. Robinson, 22 Iowa, 427; Brownlee v. Lockhart, 20 N. J. Eq. (5 C. E. Green) 239; Kepler v. Davis, 80 Penn. St. 153.
Purchases made under promise to take title for plaintiff, Dodge v. Wellman, 1 Abb. Ct. App. Dec. 512; Sandford v. Norris, 4 Id. 144; Hurst v. Harper, 14 Hun, 282; Collins v. Collins, 6 Lans. 368; 56 N. Y. 668; Wheeler v. Reynolds, 66 Id. 227; Wolford v. Herrington, 86 Penn. St. 39.
Receiver, Carr v. Houser, 46 Geo. 477.
Relatives, Ring v. McCann, 10 N. Y. 268; compared with Exp. Moore, 45 Law imes R. N. S. 558.
Resulting trusts. For the cases excepted from the abolition of resulting trusts see Lounsbury v. Purdy, 18 N. Y. 515; 11 Barb. 490 ; 6 Abb. N. Y. Dig. 10; 8 Id. 918.
For the 'trust resulting in favor of the creditors of him who pays the consideration, see 6 Abb. N. Y. Dig. 11; 7 Id. 555; 8 Id. 918, 919; Abb. Ann. Dig. 1882, 3, p. 468.
3. Oralevidence to explain grantee's capacity. The familiar rule that oral evidence is incompetent for .the purpose of varying a writing, does not exclude oral evidence adduced to show that the position of defendant was that of trustee or agent within the foregoing rule, in order to interpret a conveyance to him individually as being in contemplation of law a conveyance for the benefit of his principal or cestui gup trust. Richards v. Millard, 56 N. Y. 574; rev’g 1 Supm. Ct. ( T. & C.) 247. And see Valentine v. Belden, 20 Hun, 537,

 The allegations of the amended complaint were as follows:
1st. That the plaintiffs above named and the defendant John T. Denny at the several times hereinafter mentioned owned and held, either in their own right or in trust for others with full power of disposition as hereinafter related, thirty-six thousand shares of the capital stock of the Pacific Railroad of Missouri (a corporation duly created and organized under and by virtue of the laws of the State of Missouri) of $100 each, amounting in the aggregate to the sum of $3,600,000, at the par value of said stock.
2d. That the defendant, Garrison, at the same time held or claimed to hold, a majority of the bonds, viz.: $2,200,000 out of an issue of $4,000,000 of bonds issued by said Pacific Railroad, known as third mortgage bonds; that said bonds were of doubtful validity as a mortgage security, or as a valid obligation against said Pacific Railroad; that it was claimed by the stockholders of said Pacific Railroad that said bonds were collusive and fraudulent, and that the mortgage given to secure the payment of the same was unauthorized; that the stockholders had never authorized or consented to the mort. . gage, as is required by the laws of the State of Missouri they should *217 authorize, that the same might be a valid mortgage; that the bonds and mortgage were got up, executed and delivered collusively and fraudulently by the then directors of the Pacific Railroadthat by the terms of the bonds, the principal thereof did not become due until the first day of May, 1895; that said Garrison, and others of said bondholders claimed that there "was then past due two semi-annual coupons for interest upon said bonds; that said defendant expressed great solicitude to get said bonds adjudicated and established as valid; that said railroad at that time was in the hands of directors hostile and adverse to the stockholders thereof.
3d. That a collusive suit in the interest of said Garrison, and those associated with him, had been commenced in November 1875, by one George E. Ketchum,who claimed to be a holder of said bonds,-to foreclose said mortgage, which suit was then pending in the circuit court of the United States for the Eastern District of Missouri; that said Garrison was admitted as a co-complainant in said suit, April 3, 1870, and became the principal and active party in prosecuting the same.
That certain stockholders of said Pacific Railroad had previous to the making of the agreement hereinafter set up, intervened in said foreclosure suit, and filed an answer and cross-bill alleging collusion and fraud on the part of the directors of said Pacific Railroad, in the issue of said bonds, and in the mortgage made to secure the payment thereof, and in the defense, or want of defense, made in said foreclosure suit; that some of the plaintiffs above named had filed a petition in said foreclosure suit, to be made parties defendant to said suit, and to be allowed to intervene and defend the same in their own behalf, and in behalf of all other stockholders:
4th. That said Pacific Railroad is about 383 miles in length, extending from St. Louis, westerly to Kansas City, passing through Jefferson City, the capital of the State, and is one of the trunk lines of the country; and the plaintiffs aver, upon information and belief, that the earnings of said railroad are very large, amounting in gross to over $3,800,000 per annum, and after paying operating expenses and taxes the net earnings amount to from $1,500,000 to $3,000,000 per annum, that the fixed charges for interest upon mortgages made by said Pacific Railroad and prior in lien to the said $4,000,000 third mortgage, do not exceed $700,000 per annum, leaving as net earnings the sum of $800,000 to $1,300,000 or after paying interest upon the said $4,500,000 of mortgage, it will leave as net earnings $485,000 to *218 §985,000 which makes the stockholders’ interest the equity of redemption in said railroad of great value, viz: of the value of §8,000,000.
5th. That on or about the 29th day of March 1870, with a view of compromising said conflicting claims, and establishing the validity of said debt of §4,000,000, in the hands of said Garrison, the defendant, Garrison and others of his associate bondholders, and to prevent the plaintiffs from defending said foreclosure suit; and in consideration of the relinquishment by the plaintiffs of all further opposition to said foreclosure suit, the said Garrison, the defendant, entered into an agreement, with plaintiffs, evidenced in part by a letter written by him to some of the.plaintiffs and the defendantjDenny, a copy of which is here to attached, marked “A,” and the same is made a part of the complaint. [This letter appears in the text of our report on p. 243.]
6th. The plaintiffs aver that they and the defendant Denny performed and fulfilled all the preliminary obligations in the said agreement contained and agreed to be performed on their part and behalf, and in consequence thereof said defendant, Garrison, was enabled to procure a judgment and decree of foreclosure on or about June 6, 1876, and a sale of said premises on- or about the 6th day of September 1876, which sale was confirmed by the court in the month of October 1876, viz: October 6th, which confirmation was modified October 23¡ 1876.
7th. The plaintiffs say that in the month of June 1876, at and in the city of New York, the plaintiffs, and said Denny, at the special instance and request of the said defendant, Garrison, surrendered the aforesaid letter to said Garrison, and in consideration of such surrender and of the plaintiffs’ consenting to a modification of the terms of the said agreement with said Garrison as contained, in part, in said letter, said Garrison promised to and agreed with the plaintiffs and said Denny that in the event the said Pacific Railroad (of Missouri) should be sold under the decree of foreclosure in said suit, and in the event that he, said Garrison, or any one for him, should become the purchaser thereof, he would forthwith organize ft successor company under the laws of the State of Missouri, and would convey or cause to be conveyed thereto all the property of the said Pacific Railroad purchased at the said foreclosure sale under said decree; that the capital of the said successor company should not exceed eight'millions of dollars in amount, and that after executing new bonds and a new mortgage in the amount of four million, five hundred thousand dollars, to *219 be issued and used in satisfying a nd paying off the claims of the said, third mortgage bondholders, or of the holders of the income and improvement bonds of said company, he would deliver to the plaintiffs and said Denny in return for the amount of stock of the Pacific Railroad so as aforesaid held by them, thirty-six thousand full paid shares of the par value of one hundred dollars each, amounting in the aggregate to the sum of §3,600,000, which stock was to be issued by the said successor company, and the said Garrison then and there promised to and agreed with the plaintiffs and said Denny to purchase the said property at the said foreclosure sale, and assured them of his power and intention of protecting them in their rights of property as stockholders of the said Pacific Railroad.
That, as the agreement between the plaintiffs and said Denny and the defendant Garrison, was executory on the part of said Garrison, the plaintiffs were induced by said Garrison to make the same, because of his, the said Garrison’s representations then and there made to the plaintiffs, in this, that he, the said Garrison, had great wealth and the pecuniary ability to buy said railroad; that he, for himself, and for Russell Sage, held $1,400,000 of said bonds secured under the mortgage which was sought to be foreclosed; that he had sufficient influence with the holders of said bonds to induce them to act with him, and as he acted; and that he would so get them to act, or would pay them in cash the fro rata which they would be entitled to receive if the road was sold. By reason of the trust and confidence reposed in said Garrison and in his representations and promises, the plaintiffs were induced to make said agreement with him. The plaintiffs aver that said Garrison agreed to use his whole wealth, power and influence to carry into effect the agreement then and there made by him with the plaintiffs.
The plaintiffs aver that without their co-operation and consent, the decree of foreclosure and sale would not then have been made, or made at all until after a trial by the court, the result of which trial was in doubt. The plaintiffs claiming, as above set forth, in relation to the bonds and mortgage given to secure the payment of the same.
8th. The plaintiffs say that afterwards and on or about the 6th day of September, 1876, the said Pacific Railroad and the premises and property belonging to said company were sold under the said *220 decree in said suit, which sale was confirmed by the court as above set forth.
That at the sale James Baker, the solicitor of said Pacific Railroad in said suit, professed to purchase said mortgaged premises, and bid in the same at the sum of $3,000,000, which was at the rate of seventy-five per cent, upon the full amount of said $4,000,000, mortgage; that the said Baker paid in said third mortgage bonds, the sum bid by him to the extent of $3,948,000, of said bonds, which was received fro rata for said purchase, and gave the undertaking of the defendant Garrison and of Charles Chotean, the president of the said Pacific Railroad and one D. R. Mangam, for the fulfillment of his bid.
That the means for making said bid, or for complying therewith, .was mostly furnished to said Baker by the defendant Garrison, and the plaintiffs aver upon information and belief, that the said Garrison or the successor company, formed by the said Garrison and others, paid to the said Baker for his services a large sum, viz: $35,000.
That through said Baker, the said Garrison became the real purchaser of the said mortgaged premises, and in connection with said Baker, proceeded to organize and did organize, a new successor railroad company, called the Missouri Pacific Railway Company; that said Baker at the request of, and and for the use benefit of the said Garrison and others of said bondholders, for whom he said (garrison, acted, conveyed and assigned his purchase of said premises, to said Missouri Pacific Railway Company.
That said Baker was incapacitated from purchasing said railroad at said sale in his own behalf, by reason of his being the solicitor of the plaintiffs’ company the Pacific Railroad, and could only purchase if at all, as the representatives of the holders of said bonds, secured under the mortgage which was sought to be foreclosed, and which he appeared in court as solicitor to defend against.
That said Garrison, regardless of his duties and obligations to the plaintiffs, made an agreement with certain of said bondholders, by which he the said Garrison, assumed the purchase made by said Baker, and subsequently organized a new or successor railway company, in which organization he then and still does refuse, to allow the plaintiffs any interest or benefit.
That the said Garrison was at its incorporation elected or selected *221 himself, as the president of the said successor company, and has ever since retained said office.
That, although often requested so to do, the said Garrison lias refused and does refuse, to fulfill his said contract and agreement with the plaintiffs, and to issue, or cause to be issued and delivered to the plaintiffs, thirty-six thousand shares of stock in said company, in exchange for the stock of the Pacific Railroad, so as aforesaid held by the plaintiffs.
All of which is to the damage of the plaintiffs, in the sum of three million six hundred thousand dollars, with the interest thereon, from said 24th day of October, 1876.
That the defendant John T. Denny, refuses his consent to be joined as a plaintiff, and he is therefore made a party defendant in this action.
Wherefore the plaintffs demand judgment against the defendant, Garrison, in the sum of §3,600,000, with interest from October 24, 1876, and the costs of this action.

 Reversing 45 Super. Ct. (J & S.) 157.

 Affirming 41 Super. Ct. (J. & S.) 358.

 Affirming 9 Hun, 347.

 Affirming 7 Paige, 107.

 The decision in 42 N. Y. reversing 2 Robt. (Super. Ct.), 333; S. C., 30 How. Pr. 425 ; was limited and distinguished, on a second appeal, in 52 N. Y. 323. A further decision is reported in 39 Super. Ct. (J. & S.) 283, affirmed in 63 N. Y. 633.

 Affirming 42 Super. Ct. (J. & S.) 115.

 Reversing 3 Daly, 89.

S. C., S3 Am. R. 30 ; reversing 2 Hun, 492; S. C., 5 Supm. Ct. (T. & C.) 14.

 The rule in this case, that courts of equity will relieve against fraud in such cases, and apply the remedy by enforcing the agreement, is applied in 21 Hun, 67 ; and approved in Pomeroy on Sp. Per. § 144, note.

 Affirming 17 Hun, 84.

 Reversing 3 Supm. Ct. (T. & C.) 399.

 Affirming 61 Barb. 335.

 Reversing 39 Barb. 573.

 Reversing 23 Barb. 490; S. C., 5 Abb. Pr. 358, which, affirmed 12 How. Pr. 424.

 Affirming, in part, 59 Barb. 585; S. C., 5 Lans. 160.

 Affirming 3 Lans. 509.

 There is a further decision in the case in 45 Super. Ct. (J. & S.) 459, reversed in 81 N. Y. 630.

 Explained in Forsyth v. Clark, 3 Wend. 637, 651, as not incompatible with Bogert v. Perry, 1 Johns. Ch. 52.

 Reversing 25 Barb. 440. Ryan v. Dox was also followed in Sanford v. Morris, 4 Abb. Ct. App. Dec. 144.

 Reversing 8 Abb. Pr. N. S. 418; S. C., 1 Sweeny, 653; compare Sanford v. Norris, 4 Abb. Ct. App. Dec. 144.

 Reversing 47 Super. Ct. (J. & S.) 193.

 Reversing 1 Hun, 411; S. C., 3 Supm. Ct. (T. & C.) 598.

 S. C., 33 Am. R. 671; and 7 Abb. N. C. 65. Distinguished in 24 Hun. 196 ; and 8 Abb. N. C. 390. Confirmed in 84 N. Y. 367-378.

 Apparently affirmed in 80 N. Y. 627, but no opinion.

 Reversing 47 Super. Ct. (J. & S.) 393; S. C., 12 Weekly Dig. 52.

S. C., 15 Am. R. 430, reversing 4 Daly, 421.

 Affirming 21 Hun, 293.

 Affirming 46 Super Ct. (J. & S.) 274.

 Compare 1 Cow. 743, 744, n;

 Affirming 1 Duer, 209.

S. C., with note, in 22 Am. R. 644; rev’g 62 Barb. 316.

Affirming 4 Robt. 216.

 At the close of the plaintiff’s case, defendant moved to dismiss the complaint on various grounds very fully stated and argued.
Held, among other things, that,
1. The agreement between the intervening stockholders and the defendant was not in fraud of the creditors of the company; for stockholders, in such a case, owe no active duty to protect insecure creditors, and they had a right to receive a consideration for stipulating not to intervene.
2. If the transaction were illegal the illegality, could not avail the defendants, because the parties to the transaction were not in pari delicto, and the contract had been executed by the defendant’s converting himself into a trustee.
3. Such illegality would not be available because not pleaded in the answer.
The following extract, from the opinion of the learned referee, which was very long, presents the portion which bears upon these points. *123*5
William B. Putney (Melville M. Day, Henry L. Clinton, Joseph H. Choate, George F. Comstock, of counsel), for the motion.
Mason W. Tyler (William A. Beach, Roscoe Conkling, of counsel), opposed.
*329 Dwight, Ref:—[As to the question of fraud. ] The claim is, that the arrangement itself independent of actual fraud, is a species of implied, or constructive fraud, and that, as matter of law, it is illegal and void as between the parties to the contract themselves.
There are undoubtedly authorites to the effect that a transaction entered into between A. and B. to defraud the creditors of one of them is in some circumstances void as between the parties themselves (Nellis v. Clark, 20 Wend. 24; 4 Hill, 434).
Without considering, at this stage of the case, the exact bearing of these cases and the qualifications of and exceptions to the general principle, I am of the opinion that they have no application to the case at bar, assuming that there were unsecured creditors.
Two or three observations ought to be made in this connection.
(1.) These stockholders are not debtors in the usual sense of the term. They entered into no contract, they made no promise to the unsecured creditors. They were cestui que trusts of a trust fund, of which the unsecured creditors were also cestui que trusts, preferred, no doubt, but still, as between them, there was no relation of debtor and creditor. A receiver would have paid the creditors of the corporation first and the stockholders afterward, but there was in my opinion no active duty imposed upon the stockholders to protect the unsecured creditors.
(3.) The stockholders had no inherent power to defend the foreclosure action. They were not regularly defendants on the record. They could only come into the case at all on their own application. Having made an application to defend they could withdraw it if they saw fit. Their fraud, if any, consisted in withdrawing an application which they were not bound to make, and accepting a consideration from the defendant for such withdrawal. Was it a fraud for the other stockholders, not represented by the plaintiffs, to remain inactive? If not, then the fraud of the plaintiffs simply consisted in accepting a consideration for not doing that which they were under no legal obligation to do. The decree, if they had never intervened, would have been entered without any judgment against them. If they could properly, both in law and morals, refrain from applying to intervene, I can see no reason why they should not stipulate not to intervene. Observe, too, that their stipulation had no effect whatever on the unsecured creditors. They had superior rights to these stockholders. They, notwithstanding any arrangement made by the plaintiffs with Garrison, apparently had the right to have a receiver, or an assignee in bankruptcy in subordination to the foreclosure receiver, or to bid. at the foreclosure sale, or to take such other steps as they might be advised to take for their protection. If they lost *330 their claim on the fund, it was due to their own inattention to their interests, or unwillingness to raise the money to protect themselves, etc. There was no act of “hindering, delaying, or defrauding creditors,” such as it is within the policy of the law to prevent, by a resort to the doctrines of illegality.
(8.) The case of Nellis v. Clark (20 Wend. 24), went to the verge of the law and was decided by a narrow majority in the court of last resort. It encountered, among others, the powerful opposition of Chancellor Walworth in the court of errors (4 Hill, 424), who regarded, it as an unwarrantable extension of existing rules. I should hesitate to be the first to extend it still further to a case having the peculiar elements of the case before me.
There is, however, much more to be said on this subject.
Assuming, for the sake of the argument, that there is an element of illegality in this case, it is still an important ipquiry whether this defendant is in a position to raise the question. To establish his right to do so he cites-the maxim, “ In pari delicto, potior conditio defendentis aut possidentis.” In the vernacular, this means, that “where two parties to a contract are in equal fault, the condition of the defendant or of the possessor is,the better.” This is a maxim of much' difficulty in its proper application, subject to many limitations and qualifications, some of which will need to be considered in the present case.
(1.) The maxim requires that the two parties must be in equal fault. It is not enough that there should be fault on both sides. It must happen that the court, on measuring the fault or wrong, must find it equal. Under this rule one of the parties-may be under pressure and the other not, and the former, desiring tó.rid himself of the burden, may enter into an illegal contract with the other party, who is under-no pressure, and is struggling with no pecuniary burden growing out of the case, and the court will refuse to apply the maxim as against the debtor and in favor of the creditor. This whole rule, which may for convenience be called the “ In pari delicto" rule, is not established in favor of a party to the contract, but is a great rule of public policy, and readily gives way in the presence of a countervailing rule of public policy, to the effect that a creditor must not be permitted by the courts to oppress the debtor. It is on this account that a creditor cannot set up this rule to prevent a debtor from recovering back illegal and usurious interest which he has paid him. The parties are not deemed to be in equal fault. It was, in accord anee with this doctrine, held—in Atkinson v. Denby, 6 H. & N. 778; S. C., 7 Id. 934— that where a debtor had made payments by way of fraudulent preference to purchase a particular creditor’s assent to his discharge in bankruptcy, or to a composition deed, he might recover, back the *331 money paid. The court of Exchequer Chamber said: “It is true that both are in delicto, because the act is a fraud upon the other creditors, but it is not par delictum, because the one has the power to dictate, the other no alternative but to submit.” The same rule has been applied to compounding a penal action contrary to the statute of Elizabeth (Williams v. Hedley, 8 East, 378; Solinger v. Earle, 82 N. Y. 393, 395). While this last case makes some criticism on the principle in Atkinson v. Denby, supi’a, it does not overrule it, so that, as far as this cause is concerned, the last cited case is an argument for its decision. Ithink that Atkinson v. Denby was rightly decided, as the coercion of the creditor is shown by the fact that the agreement would not have been made by the debtor unless the creditor had made it a condition of his assent. This doctrine of “pressure” as bearing upon illegality is recognized in courts of equity as well as in law (Osborne v. Williams, 18 Vesey, 379). It seems to me that this principle applies to the case at bar. The defendant was the mortgagee in substance, for he held a majority of the third mortgage bonds and the mortgage to secure them was in the process of foreclosure. The whole mortgage was being foreclosed, whether rightly or wrongly. The whole interest of the plaintiffs in the case at bar was at hazard. They might, no doubt, have raised the coupon interest and paid off that claim, when it is to be presumed that the foreclosure suit would have been prevented. There were, however, two serious objections to that course. One was, I think, that if they had paid that money into court, it might have admitted, or at least tended to admit, the validity of the bonds, which they disputed. After such an act it would have been quite inconsistent on a subsequent foreclosure to raise the question of invalidity. Another objection would be, that if they had raised the money, etc., the road would still be under the control of the same directors to whom they imputed the breach of trust and subsequent acts from which their calamities arose. Taking the view that these plaintiffs did (and with apparent justice) of the conduct of these men, it could be scarcely expected that they would willingly invest more money to continue men in power by whom they deemed themselves to be deeply wronged. On the whole, I think that the present plaintiffs, when defendants in the Ketchum foreclosure suit, were practically under coercion on the theory of Atkinson ®. Denby and kindred cases, already cited, and that accordingly the rule of 1 ‘ In pari delicto ” cannot be urged against them.
(3.) Another important qualification of the rule “ In pari delicto," etc., is, that it does not apply to executed contracts, but rather to those which are executory in their nature. In other words, the law leaves the parties to an illegal contract where it finds them. If a *332 party has a right of action for damages on a contract it will not help him; if he has acquired property by force of the contract it will not deprive him of it. The case to which the defendant has referred as the leading one in New York draws this distinction with clearness and force (Nellis v. Clark, 20 Wend. 24, 41; S. C., 4 Hill, 424; opinion of Walworth, Chan., p. 429; Smith v. Hubbs, 1 Fairf. 71; Pollock on Contracts, 329; Ayerst v. Jenkins, L. R. 16 Eq. 275; McCullom v. Mortimer, 9 M. & W. 636). In fact the distinction is elementary and found in all the text-books. Mr. Pollock says: “A completely executed transfer of property, though originally made upon an unlawful consideration or in pursuance of an unlawful agreement, is afterwards valid ánd irrevocable, both at law and in equity ” (p. 329). Now, was not this agreement executed? On this motion, the phase of the case most favorable to the plaintiffs must be taken. In other words, is there any theory, consistent with the pleadings, either in law or in equity, on which the plaintiffs might recover?
Proceeding in this way, I think that the plaintiffs, according to the. view taken in my former opinion concerning the applicability of the Statute of Frauds, may be regarded as having rights in equity. The fair way to test their position is to ask, what were their rights in equity at the moment that Garrison bought the property, in substance, at the foreclosure sale. The plaintiffs had paid the whole consideration of the contract. Still they did not have an equitable claim to the whole property. They had a right to thirty-six-eightieths of the property, subject with the residue (forty-four-eightieths) to a mortgage for $4,500,000. I am now speaking of their rights as owners of the railroad, as distinguished from their rights in case the contract had been carried out in all its details, and they had become owners of the stock. They owned the equitable fee in the land, burdened with the mortgage. Garrison owned the mortgage. But he was in possession under his mortgage of the whole estate. His rights were complex; owner of the legal fee in his own right of forty-four-eightieths of the whole property, having the legal title of thirty-six-eightieths in trust for the plaintiffs, and mortgagee of the whole for $4,500,000, and beyond this, mortgagee in equity in possession. What we are principally concerned with is his position as to the thirty-six-eightieths belonging in fee to the plaintiffs. As to that, he was trustee on two grounds: one because he had the legal title, and the other because he was equitable mortgagee in possession. The interest of the plaintiffs was fixed and vested. There was nothing to be done further to vest the ownership. What remained was only matter of detail to make their vested interest more completely useful. If by mutual consent they had at this moment dispensed with the perform *333 anee of the residue of the contract, their respective rights would have been as I have above defined them. I regard this as falling within the doctrine of an executed contract. The result is that the court will not, on any alleged ground of illegality in the contract, out of which the trust estate grew, deprive the plaintiffs of their vested rights.
The case is thus very near to Schermerhorn v. Talman (14 N. Y. 93, 141). In that case, on page 141, the court said: “ It is an established principle of law that the courts will not entertain a suit to enforce an executory contract, made in contravention of a statute of the State. If such a contract has been executed, an action will not lie in disaffirmance of it.” After citing several cases, the court proceeds: “In this case Schermerhorn caused the title to the land in controversy to be conveyed to trustees for the benefit of the Life and Trust Company. That was an executed conveyance.” Accordingly, the court refused to disturb it.
I see no difference between this case and the present, except that iu Schermerhorn o. Taiman there was a conveyance to a trustee (a third person), while in the case at bar the defendant converted himself, by means of the contract and his subsequent acts, into a trustee. That I regard as an immaterial circumstance. The substance of the trust is the same. The defendant had the matter all in his own hands and had only some purely formal acts to do, to carry out the exact intention of the parties. He held the entire consideration; he held the property so far as it belonged to himself; he held as mortgagee in possession so far as he had a lien. The transaction was executed in the same sense as a sale of specific goods would be where the price had been paid but the documentary evidence of title had not yet been delivered to the purchaser. I do not mean to maintain that a trust which is itself transgressive of a rule of law, such as a trust violating the doctrine of perpetuities, can be upheld; such a trust can under no circumstances be valid. But if the trust when executed for moral purposes would be valid, and it is in the particular instance created for an immoral purpose, and that is the only objection to it, it will, if fully executed, be protected by the rule “In pari delicto,” to the effect that the court refuses to interfere where the contract is executed. It cannot help the defendant that he ignored the trust and cut off the plaintiffs’ right by a sale to a third person without notice. This was an act in derogation of his trust obligations and he can predicate upon it no exemption from a duty which was fastened upon him prior to such an unauthorized sale.
I regard this view as decisive of the present question in all its aspects and as preventing the defendant on the evidence, as it now stands, from raising the defense of illegality.